UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND
SOUTHERN DIVISION

| | | |
|---|---|---|
| CORINE ELAT, | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 11-2931 RWT |
| | § | |
| CAROLINE RAÏSSA EMANDOP | § | |
| NGOUBENE, | § | |
| ROXANE MARIE-FRANÇOISE | § | |
| NGOUBENE, | § | |
| DANY ESTELLE NGOUBENE, | § | |
| Defendants. | § | |

## SECOND AMENDED COMPLAINT AND ACTION OF REPLEVIN

Plaintiff Corine Elat files this Second Amended Complaint and Action of Replevin against Defendants Caroline Raïssa Emandop Ngoubene, Roxane Marie-Françoise Ngoubene, and Dany Estelle Ngoubene, and alleges as follows:

### I. INTRODUCTION

1.      Human trafficking is a modern-day form of slavery, involving victims who are forced, defrauded, or coerced into sexual or labor exploitation. Trafficking in human beings is reaching epidemic proportions throughout the world, including in the United States. Former President George W. Bush called human trafficking a special kind of evil in the abuse and exploitation of the most innocent and vulnerable. And Congress, recognizing the countless human tragedies such practices inflict, passed the Trafficking Victims Protection Reauthorization Act of 2003 ("TVPRA"), establishing a private cause of action for victims of human trafficking in order to make those victims whole and deter the perpetrators from committing such acts. This

action is brought under the TVPRA and state laws to seek just compensation for Plaintiff—a victim of human trafficking—and bring the perpetrators to account.

## II. JURISDICTION AND VENUE

2.  This Court has original jurisdiction based on the TVPRA, 18 U.S.C. § 1595.

3.  This Court has supplemental jurisdiction over the related state law claims under the doctrine of pendent jurisdiction and pursuant to 28 U.S.C. § 1367. Supplemental jurisdiction over these claims is appropriate because they arise from the same common nucleus of operative facts from which the federal claims arise.

4.  Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because Defendants reside in the District of Maryland, Southern Division, and because all or substantially all of the events giving rise to the claims in the Complaint occurred in the District of Maryland.

## III. PARTIES AND NON-PARTY CONSPIRATORS

5.  Plaintiff is a citizen of Cameroon who resided at the same College Park, Maryland home as Defendants did for approximately two years. From the time of her May 2008 escape from Defendants' home through the present, she has resided at an undisclosed location in the District of Columbia metropolitan area. Plaintiff remains in the United States on a T-visa, a type of visa granted to victims of human trafficking.

6.  Defendant Caroline Raïssa Emandop Ngoubene ("Caroline Ngoubene") is a citizen of Cameroon who resided at 9001 Gettysburg Lane, College Park, Maryland 20740, from at least January 2006 through May 2008. Defendant Caroline Ngoubene is 31 years old. She has been served and has appeared in this action.

7.      Defendant Roxane Marie-Françoise Ngoubene ("Roxane Ngoubene") is a citizen of Cameroon who resided at 9001 Gettysburg Lane, College Park, Maryland 20740, from at least January 2006 through May 2008.  Defendant Roxane Ngoubene is 26 years old.  She has been served and has appeared in this action.

8.      Defendant Dany Estelle Ngoubene ("Dany Ngoubene") is a citizen of Cameroon who resided at 9001 Gettysburg Lane, College Park, Maryland 20740, from at least January 2006 through May 2008.  Defendant Dany Ngoubene is 28 years old.  She has been served and has appeared in this action.

9.      François Ngoubene is a non-party who conspired with the named defendants to abuse and subject Plaintiff to forced labor.  François Ngoubene is a citizen of Cameroon who resides at 9001 Gettysburg Lane, College Park, Maryland 20740, where he has lived since at least January 2006.  During the relevant time period, François Ngoubene was employed as Second Consular at the Embassy of Cameroon in Washington, D.C.

10.     Marie-Thérèse Ngoubene is a non-party who conspired with the named defendants to abuse and subject Plaintiff to forced labor.  Marie-Thérèse Ngoubene is a citizen of Cameroon who resided at 9001 Gettysburg Lane, College Park, Maryland 20740, from at least January 2006 through May 2008.  She is the wife of François Ngoubene.

11.     Collins Rene Ngoussomo ("Collins Ngoussomo") is a non-party who conspired with the named defendants to abuse and subject Plaintiff to forced labor.  He is a citizen of Cameroon who resided at 9001 Gettysburg Lane, College Park, Maryland 20740, from at least January 2006 through May 2008.

3

12.     Collectively, the Defendants, François Ngoubene, Marie-Thérèse Ngoubene, and Collins Rene Ngoussomo shall be referred to below as the "Ngoubene Family."

13.     The Defendants agreed and acted in concert with each other and with other members of the Ngoubene Family to commit the acts and abuses described in this Second Amended Complaint.

## IV.  FACTS

**Plaintiff is Induced to Come to the United States**

14.     In late 2005, Plaintiff was living in Cameroon and attending high school. Plaintiff's mother informed her that François Ngoubene, Plaintiff's uncle by marriage, wanted to bring Plaintiff to live with him and his family in the United States while she attended nursing school and worked at a job to pay for her education.  Plaintiff was very excited by this offer and the opportunity to seek a better life for her and her family.

15.     Soon thereafter, Marie-Thérèse Ngoubene informed Plaintiff, through Plaintiff's mother, that she had found a job for Plaintiff in the District of Columbia metropolitan area.  A flurry of activity ensued, and Plaintiff was pressured to act quickly to avoid missing this employment opportunity.

16.     On or about January 16, 2006, Plaintiff met with François Ngoubene in Cameroon.  During this meeting, François Ngoubene made Plaintiff hastily sign a number of documents written in English.  François Ngoubene represented that the documents were for obtaining Plaintiff's travel documents to the United States, but he did not give her time to read them and, in fact, physically covered up portions of them to prevent Plaintiff from reading what

she was signing.  Plaintiff's limited comprehension of English at the time further impaired her understanding of what she was signing.

17.     During this meeting, François Ngoubene said nothing about Plaintiff's coming to the United States to work for his family as a domestic worker.  Instead, Plaintiff continued to believe that she would be living with the Ngoubene Family while she attended nursing school and worked at a job elsewhere in the District of Columbia metropolitan area.

18.     Unbeknownst to Plaintiff, one of the documents she signed was an employment contract ("the Contract") (attached as Exhibit A).  This Contract was typed on the letterhead of the Embassy of the Republic of Cameroon and indicated that Plaintiff was being hired by François Ngoubene as a domestic worker for a renewable period of one year.  The Contract further provided that Plaintiff was to be paid $9.38 an hour per 40 hours a week of work and that there would be no deduction from this amount for food and lodging.

19.     François Ngoubene induced Plaintiff to sign this Contract so that he could improperly obtain a G-5 visa for Plaintiff to come to the United States.

20.     Upon information and belief, the Contract was drafted by Defendant Caroline Ngoubene, who is an attorney licensed to practice law and who lives with François Ngoubene.

21.     Plaintiff departed for the United States in April 2006, temporarily leaving behind her future husband and their three-year old daughter, with the hope of an education and better life before them.

**Plaintiff Enters a Life of Servitude in the United States**

22.     Plaintiff arrived in the United States on or about April 19, 2006. Marie-Thérèse Ngoubene picked Plaintiff up from the airport on that date and brought her to the home of the Ngoubene Family in College Park, Maryland ("the Ngoubenes' home").

23.     Immediately upon arriving at the Ngoubenes' home, Plaintiff was confronted with a life that contrasted starkly with what she had been promised.

*Defendants prevent Plaintiff from attending school and force her to perform around-the-clock labor.*

24.     The members of the Ngoubene Family, including each of the Defendants, forced Plaintiff to perform constant domestic tasks for them. They did not allow Plaintiff to enroll in and attend nursing school, and no member of the Ngoubene Family ever again mentioned the job that Marie-Thérèse Ngoubene said she had found for Plaintiff—and which had been the pretext for forcing her to rush through the emigration process.

25.     On most days, Plaintiff was forced to wake up before 6 a.m. to cook breakfast and make coffee for the Ngoubene Family, including the Defendants, and their guests. She would then clean up the breakfast and wash the dishes by hand as Marie-Thérèse Ngoubene did not permit her to use the dishwasher in the kitchen.

26.     The rest of Plaintiff's day was consumed with cleaning the house's seven bedrooms, two kitchens, and four bathrooms, and cooking and then cleaning-up after lunch and dinner. She was also required to do the laundry, wash the cars, and go shopping for groceries for the Ngoubene Family, including the Defendants, and their guests. As a result, Plaintiff had little or no time to herself until she was permitted to go to bed, exhausted, usually around 11 p.m., after working for more than seventeen hours with very few breaks.

27.     During the more than two years that Plaintiff served the Defendants, none of the Defendants ever paid her for any of this work.

### Plaintiff is forced to live in inhumane conditions.

28.     During her time of servitude to the Defendants, Plaintiff was given very little food and often went hungry.  Plaintiff was only allowed to eat whatever leftovers remained from the meals she cooked for the Ngoubene Family, including the Defendants, and their guests.  She was never allowed to take any food without first obtaining the permission of Defendants or some other member of the Ngoubene Family.

29.     Plaintiff was refused medical treatment when she became ill, and was told that even providing her with over-the-counter medications would cost too much.  When Plaintiff became ill, she was instructed to drink more water until she felt better.

### The Defendants isolate Plaintiff from the outside world.

30.     In order to control Plaintiff and maintain the conditions of her involuntary servitude, the Defendants worked together and with other members of the Ngoubene Family to isolate Plaintiff from the outside world and otherwise prevent her from leaving the house alone.

31.     Plaintiff was only allowed to leave the Ngoubenes' home when accompanied by some member of the Ngoubene Family, which often included at least one of the Defendants. When outside the Ngoubenes' home, she was forbidden from speaking to anyone, a rule enforced by whoever accompanied her, including the Defendants.

32.     Even with respect to these supervised excursions outside the Ngoubene home, she was mostly allowed only to attend English language classes and classes toward a General Educational Development certificate, buy groceries for herself and the Ngoubene Family, and

attend church.   Otherwise, Plaintiff's time was almost completely occupied by serving the Defendants, the rest of the Ngoubene Family, and their guests.

33.     When Plaintiff was allowed to leave the Ngoubenes' home to attend class, the Ngoubene Family, including the Defendants, expected Plaintiff to fulfill the same daily tasks, thus forcing her to work late into the night, sometimes as late as 1:00 a.m.

*Feeling she has no alternative, Plaintiff continues serving the Defendants.*

34.     Plaintiff remained with the Ngoubene Family, including the Defendants, hoping that they would eventually allow her to attend nursing school.   Marie-Thérèse Ngoubene played upon these hopes, repeatedly bringing up the possibility of Plaintiff attending nursing school at some later point and warning Plaintiff that François and Marie-Thérèse Ngoubene would send Plaintiff back to Cameroon without this greatly desired education if Plaintiff did not do what they demanded of her.   Upon information and belief, the Defendants all agreed to play along with these and similar deceptions.

35.     Plaintiff also feared the consequences she faced if she tried to leave.   Plaintiff knew very few people in the United States and did not know where she would go if she left the Ngoubenes' home.   Further, because none of the Defendants ever paid her for her work, Plaintiff had little money to afford transportation or lodging if she tried to leave.

36.     The Defendants conspired together and with the rest of the Ngoubene Family to impose a sense of hopelessness and isolation on Plaintiff by making her believe that she could not leave them because she was "illegal" and did not have the appropriate papers to go anywhere else.   Caroline Ngoubene, a licensed attorney who purports to practice immigration law,

specifically told her that she was illegal and could not leave.  Marie-Thérèse reinforced this

misinformation by telling Plaintiff that she would be arrested if she tried.

37.     Further, after Plaintiff expressed a desire to leave the Ngoubenes' home for good,

Defendant Roxane Ngoubene went through Plaintiff's possessions in an unsuccessful attempt to

seize Plaintiff's passport and prevent Plaintiff from escaping.

38.     Plaintiff lived in constant fear of the Ngoubene Family, including the Defendants,

who furthered Plaintiff's hopelessness by verbally abusing, threatening, and demeaning her.

Plaintiff was made to fear retribution to herself or her family if she disobeyed any of the

members of the Ngoubene Family or attempted to leave the Ngoubenes' home.  Plaintiff was

made to believe that the Ngoubene Family was well-connected to the Cameroonian Embassy in

the United States and to the government in Cameroon, and that the Ngoubene Family was willing

to use this power to harm Plaintiff or her family or force Plaintiff back into a life of servitude if

she escaped.

**Plaintiff Is Taken Back to Cameroon to Change Her Visa**

39.     In or about July 2007, Plaintiff returned to Cameroon with François and Marie-

Thérèse Ngoubene.  The purpose of this trip was to change Plaintiff's visa from a G-5 visa to an

A-3 visa, because Plaintiff did not qualify for a G-5 visa.  While in Cameroon with the

Ngoubenes, Plaintiff was almost constantly confined to François and Marie-Thérèse Ngoubenes'

home, except when François Ngoubene took her to the American embassy to change her visa.

40.     While in Cameroon, Plaintiff did not want to return to the United States with

François and Marie-Thérèse Ngoubene, but she was now dependent on them and under their

psychological and physical control.  To reinforce this control and further induce Plaintiff's

cooperation, Marie-Thérèse Ngoubene told Plaintiff that she could bring her now four-year old daughter back to the United States to live with them and the Defendants. Plaintiff was deceived into believing that having her daughter in the Ngoubenes' home would result in better treatment for herself and expanded educational opportunities for her daughter. Plaintiff therefore cooperated in returning to the United States and brought her daughter with her.

41.     While in Cameroon, Plaintiff and her now-husband were secretly married.

**Abuse Worsens Upon Plaintiff's Return to United States**

42.     After Plaintiff returned to the United States on or about September 19, 2007, she quickly realized that the presence of her daughter was not going to result in better treatment from the Defendants or other members of the Ngoubene Family.

43.     Marie-Thérèse Ngoubene immediately informed Plaintiff that she expected her to work as if her daughter were not there. Plaintiff was required to perform all the same tasks that she had done before, leaving little time to spend caring for her daughter as she had expected to do. The Defendants were aware of this instruction from Marie-Thérèse and continued to enforce and benefit from Plaintiff's forced and involuntary servitude as they had before.

44.     Plaintiff and her daughter were forced to move into an extension behind the garage of the Ngoubenes' home. This room did not have a bathroom, running water, heating, air conditioning, or any furnishings besides a bed, which Plaintiff and her daughter had to share.

45.     Without heating, the extension became unbearably cold during the winter. This was only made worse by a break in the siding covering the extension through which frigid air seeped, causing Plaintiff's daughter to become so cold that Plaintiff had to use every article of clothing she owned to cover her while she slept.

46.     This extension was connected to the main house by a door that was normally locked.  Plaintiff and her daughter had to knock and wait for someone to let them into the house so they could use the bathroom or any other facility in the house.  During the night, Plaintiff and her daughter had almost no access to the bathroom.

47.     The Ngoubene Family, including the Defendants, did not increase the amount of food they provided Plaintiff after her daughter began living in their home, continuing to only allow them to eat the leftovers of the food Plaintiff cooked for the Ngoubene Family and their guests.  Marie-Thérèse Ngoubene, with the knowledge and approval of the Defendants, accused Plaintiff and her daughter of being "thieves" whenever they sought to eat anything more than leftover scraps.

48.     Defendants' grandmother came to the United States to live with the Ngoubene Family at or around this time.  Plaintiff was required to provide all of the home-nursing care for her in addition to her other tasks.

**Plaintiff Learns How She Was Duped Into Forced Labor**

49.     In order to enroll her daughter in school, Plaintiff was required to provide the school with her rental agreement and proof of income.

50.     When Plaintiff asked Marie-Thérèse Ngoubene for this information, Marie-Thérèse Ngoubene provided information about her and her husband's income.  After the school repeatedly rejected this information as insufficient evidence of Plaintiff's income, Marie-Thérèse Ngoubene provided Plaintiff with a series of documents, but warned her that she had to bring the documents back immediately.

51.     Included in these documents was the "Contract of Employment" that Plaintiff had unknowingly signed before she originally left Cameroon. Having improved her English since her arrival in the United States, Plaintiff could now read the document and see that it provided that she would come to the United States as a domestic worker and that she would be paid for her services. Plaintiff clandestinely scanned and emailed these documents to her husband in Cameroon.

52.     At around the same time, Plaintiff's husband spoke to an individual at the American embassy in Cameroon and learned that the visa François Ngoubene had obtained for Plaintiff to come to the United States was not for students, as Plaintiff had thought, but for domestic workers of diplomats and their households. This, together with the Contract, confirmed that the Ngoubene Family never had any intention of allowing Plaintiff to go to school, and that the promise of schooling was a ruse to get Plaintiff to continue working for them without pay.

**Plaintiff Escapes from the Defendants**

53.     On or about April 30, 2008, Plaintiff's husband, after learning of the Contract and of the true state of Plaintiff's living arrangements from Plaintiff's daughter, traveled to the United States from Cameroon to rescue his family.

54.     On or about May 2, 2008, after Plaintiff's husband arrived in the United States, Plaintiff informed François Ngoubene that she was leaving and would no longer be working for him and his family. François Ngoubene became angry and demanded Plaintiff's passport and all of her documents. When Plaintiff informed him that she did not have these documents, some or all of the Defendants searched Plaintiff's possessions. Fortunately, Plaintiff had secretly given

these documents to her husband after his arrival in the United States, and they could no longer be used to threaten her.

55.     In order to obtain permission to leave the house, Plaintiff told François and Marie-Thérèse Ngoubene that she would retrieve her passport and return it. Once out of their presence, however, she and her daughter escaped with the help of her husband. Plaintiff and her daughter escaped from the Ngoubenes' home with only the clothes on their backs.

56.     On or about May 28, 2008, Plaintiff's husband contacted François and Marie-Thérèse Ngoubene and requested that he and Plaintiff be allowed to retrieve their family belongings from the Ngoubenes' home. These belongings included items of great sentimental value and most of Plaintiff's and her daughter's clothes. When François and Marie-Thérèse Ngoubene refused, Plaintiff's husband asked the police to accompany him to the Ngoubenes' home to retrieve the items. The police did so, but were prevented from entering the Ngoubenes' home after François and Marie-Thérèse Ngoubene claimed diplomatic immunity. Marie-Thérèse Ngoubene told the police that she would only return Plaintiff's belongings if Plaintiff "returned" her passport to them.

**Defendants' Abuse Continues After Plaintiff's Escape and Delays Lawsuit**

57.     Since her escape, Plaintiff and her family have lived in continual fear of the Ngoubene Family, as they have repeatedly threatened to physically harm Plaintiff and her family (both here and in Cameroon) and to have Plaintiff and her family deported. These threats, designed to prevent Plaintiff from seeking redress for her injuries, began soon after Plaintiff's escape and have continued even after the filing of this lawsuit.

58.     On or about June 3, 2008, Plaintiff's attorney sent a letter addressed to Francois

Ngoubene requesting a conversation about compensating Plaintiff for her years of unpaid labor.

Defendants did not respond to this letter in writing, but they did respond with physical violence.

On or about September 6, 2008, at approximately 11 p.m., Guy Patrick Ewounkem, the brother

of Marie-Thérèse Ngoubene and the uncle of the Defendants, came to the business where

Plaintiff was employed.  He proceeded to severely beat Plaintiff and her husband.  (Following

this event, the District Court of Maryland for Montgomery County issued a Protective Order

against Mr. Ewounkem that forbade him from threatening, abusing, contacting, or entering

Plaintiff's residence or place of employment.)

59.     Almost six months later, in approximately February 2009, Plaintiff and her

husband had a meeting with the Cameroonian Ambassador to inform him of the Ngoubene

Family's conduct and to request his assistance in obtaining compensation for her forced labor.

Again, the Ngoubene Family responded to this information with threats of physical violence.  On

or about March 7, 2009, Plaintiff's mother called her at approximately 10:00 p.m. ET, or 1:00

a.m. in Cameroon, crying uncontrollably.  She said that Marie-Thérèse Ngoubene was in

Cameroon threatening to send people to hurt Plaintiff and her family or have them deported.

Plaintiff's mother was so worried that she encouraged Plaintiff and her family to leave the state

so that the Ngoubene Family could not harm them.  Fearing repercussions, Plaintiff temporarily

abandoned her efforts to seek relief.

60.     Plaintiff gained the courage to renew her claims about one year later.  On January

20, 2010, she received notice from the United States Department of Homeland Security that her

application for a T-1 Nonimmigrant Classification ("T-Visa") had been approved.  A T-Visa is a

type of visa granted only to victims of severe forms of human trafficking.  Following this, on April 21, 2010, Plaintiff's attorneys sent a letter addressed to François and Marie-Thérèse Ngoubene requesting a meeting to discuss Plaintiff's just compensation.  Then, on September 29, 2010, her lawyers sent a letter to the Cameroonian Ambassador requesting his assistance on the same subject.

61.     In response to these communications, in October 2010, Marie-Thérèse Ngoubene made daily telephone calls to Plaintiff's mother in Cameroon threatening to harm Plaintiff and/or her family if Plaintiff proceeded with her intent to sue.  In addition to threats of physical harm, Marie-Thérèse Ngoubene threatened that the Cameroonian Embassy's police were looking for Plaintiff and her family in order to detain them and deport them.

62.     Around this time, the Ngoubene Family's lawyer also drafted a letter dated November 10, 2010, that purported to address Plaintiff's claims.  He never sent the letter, however, because, on information and belief, his clients informed him that it would not be necessary.   They believed their violence and threats of violence had been successful in preventing Ms. Elat from advancing her claims.

63.     The Ngoubene Family learned that Ms. Elat was still considering her claims in March 2011.   Therefore, on or about March 20, 2011, in the afternoon, Lucien Epah (Defendants' uncle and Plaintiff's relative) came to Plaintiff's home purportedly to give her money from her mother.  Instead, Epah proceeded to scream at Plaintiff and physically threaten Plaintiff if she proceeded with her intent to sue the Ngoubene Family, indicating that she would "be in a bad place" if she did so.  Like Marie-Thérèse Ngoubene, he threatened that François Ngoubene could send the Cameroonian Embassy's police to come get Plaintiff and her family.

64.     Knowing that the Ngoubene Family had previously sent an agent to beat her and her husband, that they were willing to break the law because of their alleged diplomatic immunity, and believing that the family was powerful, Plaintiff reasonably believed that they would act on their threats.  As shown above, the threatening actions of the Ngoubene Family and their agents caused Plaintiff to temporarily abandon her claims out of fear several times before filing her lawsuit on October 13, 2011.

65.     Because of the conspiracy that existed between all members of the Ngoubene Family to force Plaintiff to perform domestic services for them, Plaintiff reasonably believed that all of these threats were made on behalf of the Defendants and that a lawsuit against any of the members of the Ngoubene Family would result in repercussions for her family.

66.     Unsurprisingly, the Ngoubene Family's threats have continued since the filing of this lawsuit.  Recently, Marie-Thérèse Ngoubene told Plaintiff's mother that Plaintiff should "remember that she has kids."  Plaintiff's husband also found his vehicle heavily vandalized, including a smashed window and a hub cab left in the driver seat as if to send a message.

67.     Plaintiff has suffered from depression, insomnia, physical anguish, and emotional anxiety at the hands of Defendants.  Despite their ongoing threats, she courageously seeks justice.

## V.  CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF
TVPRA; Forced Labor
(18 U.S.C. §§ 1589, 1595)

68.     Plaintiff incorporates each of the foregoing paragraphs by reference.

69.     Defendants schemed and conspired both together and with others to obtain, and did obtain, forced labor from Plaintiff by means proscribed in Section 1589(a).  Each Defendant knew that Plaintiff's labor was forced and each Defendant knowingly benefitted from it.

70.     As a result of Defendants' conduct, Plaintiff was compelled to continue laboring for them under inhumane conditions and suffered damages.  Pursuant to 18 U.S.C. § 1595, Plaintiff is entitled to recover damages and reasonable attorneys' fees for Defendants' wrongful conduct.  Because of the malicious and wantonly abusive nature of Defendants' conduct, Plaintiff is also entitled to an award of punitive damages.

## SECOND CLAIM FOR RELIEF
False Imprisonment and Conspiracy to Commit False Imprisonment

71.     Plaintiff incorporates each of the foregoing paragraphs by reference.

72.     Defendants conspired and worked in concert to intentionally deprive Plaintiff of her liberty without her consent and without legal justification.

73.     Defendants had no legal authority for this detention.

74.     Plaintiff has suffered damages in an amount to be determined at trial, and in any event may recover nominal damages.  Further, Defendants' tortious conduct was aggravated by the willfulness, wantonness, and malice for which the law entitles Plaintiff to a recovery of exemplary damages.

## THIRD CLAIM FOR RELIEF
Quantum Meruit

75.     Plaintiff incorporates each of the foregoing paragraphs by reference.

76.     Plaintiff has conferred significant benefits upon Defendants by performing the above-mentioned labor for them.

77. Defendants have not tendered appropriate payment to Plaintiff for these services.

78. Defendants are liable under quantum meruit for the services that Plaintiff provided.

79. As a result of Defendants' conduct, Plaintiff has suffered damages.

80. Plaintiff is entitled to recover damages in an amount to be proven at trial, including attorneys' fees and the cost of this action.

## FOURTH CLAIM FOR RELIEF
Unjust Enrichment

81. Plaintiff incorporates each of the foregoing paragraphs by reference.

82. By providing Defendants with around-the-clock labor for more than two years, Plaintiff conferred substantial benefits on Defendants.

83. Defendants accepted and retained the benefits conferred upon them by Plaintiff, but have provided Plaintiff with no compensation for those benefits.

84. It would be inequitable for Defendants to be permitted to retain such benefits without paying Plaintiff the value of the benefits conferred.

85. Accordingly, Plaintiff is entitled to an award equal to the value of the benefits conferred upon Defendants in an amount to be determined at trial, including attorneys' fees and the cost of this action.

## ACTION OF REPLEVIN
Md. Code Ann., Md. Rules. § 12-601 (West 2011)

86. Plaintiff incorporates each of the foregoing paragraphs by reference.

87.     When Plaintiff escaped from the Defendants' home, she was forced to leave her identification card issued by the state of Cameroon ("Cameroonian ID card"). Plaintiff's Cameroonian ID card is needed for her to participate in government services, and is invaluable.

88.     Defendants are unjustly detaining Plaintiff's Cameroonian ID card by refusing to return it to her despite multiple requests to do so by Plaintiff.

89.     Plaintiff hereby makes a claim for the return of the property being unjustly detained by the Ngoubenes.

90.     Plaintiff is entitled to recover damages she has suffered and will suffer as a result of the Defendants' failure to return her Cameroonian ID card.

91.     Accordingly, as soon as possible, the Court should issue a writ directing the sheriff to place Plaintiff in possession of her Cameroonian ID card pending final resolution of this lawsuit.

### EQUITABLE ESTOPPEL

92.     Plaintiff incorporates each of the foregoing paragraphs by reference.

93.     Due to their actions and the actions of others in preventing Ms. Elat from filing her lawsuit at an earlier date, as described above, Defendants are equitably estopped from asserting the defense of limitations.

### JURY DEMAND

94.     Plaintiff requests a trial by jury.

### VI.   PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiff prays that this Court:

1.      Issue a writ directing the sheriff to place Plaintiff in possession of her
        Cameroonian ID card pending final resolution of this lawsuit;

2.    Rule in favor of every cause of action asserted in the Complaint;

3.    Award such damages as may be appropriate, including punitive damages;

4.    Award Plaintiff her attorneys' fees and costs;

5.    Award Plaintiff pre- and post-judgment interest; and

6.    Award any such other and further relief as the Court deems just and proper.

DATED this 4th day of June 2012.          Respectfully submitted,


BAKER BOTTS L.L.P.


*/s/ Jonathan R. Mureen*
    Sara E. Kropf
    U.S. District Court of Md. Bar No. 26818
    sara.kropf@bakerbotts.com

    Stephen M. Ng (admitted *pro hac vice*)
    Virginia State Bar No. 73265
    stephen.ng@bakerbotts.com

1299 Pennsylvania Avenue, NW
Washington, D.C. 20004
Telephone:  (202) 639-7700
Fax:  (202) 585-4075

    Van Beckwith (admitted *pro hac vice*)
    Texas State Bar No. 02020150
    van.beckwith@bakerbotts.com

    Jonathan R. Mureen (admitted *pro hac vice*)
    Texas State Bar No. 24060313
    jon.mureen@bakerbotts.com

    Russell W. Fusco (admitted *pro hac vice*)
    Texas State Bar No. 24069743
    russell.fusco@bakerbotts.com

2001 Ross Avenue, Suite 600
Dallas, Texas 75201-2080
Telephone:  (214) 953-6500
Facsimile:  (214) 855-8200

ATTORNEYS FOR PLAINTIFF

## CERTIFICATE OF SERVICE

I hereby certify that on June 4, 2012, I caused a copy of the foregoing to be electronically filed with the United States District Court, District of Maryland, and notice will be served by operation of the Court's electronic filing system on representatives of all parties to this litigation:

> Timothy F. Maloney, Esq.
> Hina Z. Hussain
> Joseph, Greenwald & Laake, P.A.
> 6404 Ivy Lane
> Suite 400
> Greenbelt, MD 20770
> *Counsel for Defendants*

June 4, 2012

/s/ *Jonathan R. Mureen*
Jonathan R. Mureen (admitted *pro hac vice*)
Texas State Bar No. 24060313

***Attorney for Plaintiff Corine Elat***