**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
*Southern Division*

CORINE ELAT,                 \*

     Plaintiff,           \*

v.                              \*

                                       Civil Case No.: PWG-11-2931
CAROLINE RAISSA EMANDOP    \*
    NGOUBENE, *et al.*,
                                    \*

     Defendants.        \*

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

## MEMORANDUM OPINION

This Memorandum Opinion addresses the Motion for Summary Judgment and Memorandum in Support that Defendants Caroline Raïssa Emandop Ngoubene, Roxane Marie-Françoise Ngoubene, and Dany Estelle Ngoubene filed ("Summ. J. Mot." and "Mem."), ECF No. 158; Plaintiff Corine Elat's Opposition ("Opp'n to Summ. J."), ECF No. 155, which I construe to incorporate a Motion to Amend, as discussed in Part III below; and Defendants' Reply ("Summ. J. Reply"), ECF No. 160. It also addresses Defendants' Motion in Limine to Exclude Plaintiff's Expert Witness ("Mot. in Limine"), ECF No. 159; Plaintiff's Opposition ("Opp'n to Mot. in Limine"), ECF No. 156; and Defendants' Reply ("Mot. in Limine Reply"), ECF No. 161.[1]

Having reviewed the filings, I find that a hearing is unnecessary. *See* Loc. R. 105.6. For the reasons stated below, Defendants' Motion in Limine is GRANTED IN PART and DENIED IN

---

[1] The parties initially filed unredacted briefings, which they sought to file under seal. *See* ECF Nos. 128, 135, 136, 141, 145, and 147. I ordered the parties to file redacted memoranda and exhibits, ECF No. 150, and the parties filed the briefings that currently are before me. Defendants' unredacted Motion for Summary Judgment, ECF No. 128, and Defendants' unredacted Motion in Limine, ECF No. 135, are DENIED AS MOOT in light of ECF Nos. 158 and 159.

PART; Plaintiff's Motion to Amend is DENIED; and Defendants' Motion for Summary Judgment is GRANTED IN PART and DENIED IN PART.

## I.    BACKGROUND[2]

In January 2006, while Plaintiff was in her early twenties and living in her homeland of Cameroon, Plaintiff's aunt and uncle, Marie-Thérèse and François Ngoubene, invited her to the United States to live with them and their children, including three of their daughters, who are Defendants in this case.[3] Elat Dep. 20:10–20, 150:3 – 154:1, Feb. 8, 2013 ("Elat Dep."), Pl.'s Opp'n to Summ. J. Ex. H.[4] Although Plaintiff's allegations are far broader than the evidentiary support she provides, the essence of her supported allegations regarding the beginning of her alleged servitude is that she met with her uncle, François Ngoubene, after her mother spoke with her aunt, Marie-Thérèse Ngoubene, and he had her sign documents with the understanding that she might have the opportunity to live and work in the United States. Plaintiff alleges that she did not know that she signed a contract to work as a domestic servant for the Ngoubenes. Second Am. Compl. ¶¶ 16–18, ECF No. 44. In support, Plaintiff offers her own deposition testimony, which is unrebutted, as neither Marie-Thérèse or François Ngoubene was deposed.

Plaintiff's testimony portrays a culture in Cameroon in which children are subservient to and do not question adult authority figures, even after reaching adulthood themselves. She

---

[2] In reviewing the evidence related to a motion for summary judgment, the Court considers undisputed facts, as well as the disputed facts viewed in the light most favorable to the non-moving party. *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009); *George & Co., LLC v. Imagination Entm't Ltd.*, 575 F.3d 383, 391–92 (4th Cir. 2009); *Dean v. Martinez*, 336 F. Supp. 2d 477, 480 (D. Md. 2004).

[3] As discussed below, Plaintiff originally named François and Marie Thérèse Ngoubene among the defendants, Compl., ECF No. 1, but they were dismissed based on diplomatic immunity, ECF No. 43, leaving only Caroline, Roxane, and Dany Ngoubene as defendants.

[4] Plaintiff attached all of her exhibits to her Opposition to Summary Judgment as one file, ECF No. 155-1.

testified that "the grown-ups" would talk amongst themselves to make decisions pertaining to their children. Elat Dep. 154:6 – 155:9. For example, Plaintiff met Bertin Minosa, who is now her husband, when she was about seventeen or eighteen years old, *see id.* at 128:1–3, and at some point thereafter, became pregnant with his child and moved in with him, *id.* at 136:14–137:2. After the baby was born, Plaintiff and Mr. Minosa continued their relationship, but Plaintiff moved back in with her mother "just because [their] parents suggest[ed] things and [they] agreed on it." *Id.* at 141:21 – 143:18. Additionally, before coming to the United States, Plaintiff had planned to work at whatever job "[her] mom would help [her] find." *Id.* at 147:21 – 148:1.

In her deposition testimony, Plaintiff described a day in which her mother told her to meet with her uncle, François Ngoubene, she went to her uncle's house in Cameroon, and they hurriedly went for a ride in his car. Elat Dep. 58:19 – 60:16; 150:3 – 152:6. During the ride, Mr. Ngoubene mentioned that he was not sure whether Plaintiff or an aunt of hers, Nicole, would be going to the United States with him. *Id.* at 152:16 – 154:1. They stopped at a "copy stand," but she did not "really know what he wanted to do at the copy stand" and did not "know what he told [the men at the stand] exactly"; Plaintiff signed some "folded-up papers" that were written in English, a language she did not speak then; and they went to the Cameroonian Ministry of Foreign Affairs, where Plaintiff "was just standing there" and "didn't know why [she] was there." *Id.* at 152:5–15; 156:3 – 161:9. Throughout the visit, Plaintiff never asked what was happening. *Id.* at 151:13 – 161:9. Nor did she ask her uncle what the documents were that she signed, "because [she] trusted him." *Id.* at 168:15-18. Plaintiff testified that, a couple of days later, her aunt told her she would have a job, but she did not "ask anything about the job." *Id.* at 169:14 – 170:9.

Plaintiff attached to her Second Amended Complaint the document that she signed the day that she met with her uncle, François Ngoubene, in Cameroon. Contract, Second Am. Compl. Ex. A, ECF No. 44-1. The document, titled "Contract of Employment," is between François Ngoubene as "Employer" and Corine Elat as "Employee." Contract 1. The Contract states that Plaintiff "is hired to perform as a domestic worker" and "shall be remunerated on the basis of $9.38 an hour per 40 hours a week," with "no deduction for food and lodging." *Id.* art. 2 & 3. The Contract is dated January 16, 2006.[5] *Id.* at 2.

Plaintiff obtained an identification card to leave Cameroon. Elat Dep. 161:15–20. Although she was aware that her card listed her occupation as "housekeeper," she believed "there was confusion or mistake on that card." *Id.* at 163:15 – 165:19. She did not try to correct the identification card "because it was a struggle to get the card" in the first place. *Id.* at 166:2–5.

Plaintiff began living with the Ngoubenes in College Park, Maryland in April 2006. Pl.'s Opp'n to Summ. J. 3; Defs.' Mem. 14. She returned to Cameroon with the Ngoubene family in the summer of 2007 for two months, and then brought her daughter, J., with her when she returned to the Ngoubene home in the United States. Elat Dep. 37:14–17, 104:21 – 105:7; 107:9–21; 115:13 – 116:8. At the Ngoubene home, Plaintiff worked long days "doing household chores." *Id.* at 241:6 – 242:4. Specifically, she prepared breakfast and cooked meals for the family, *id.* at 208:13 – 211:18, 224:5–6, 225:9–10; washed dishes, *id.* at 213:17–19, 214:2–13; "did the guests' laundry," *id.* at 246:20; cleaned the house and shopped for groceries, *id.* at 241:6 – 242:4; washed cars, *id.* at 245:13–20; and braided Defendants' hair, Elat Dep. 497:17 – 499:4, May 10, 2013 ("Elat Dep. II"), Pl.'s Opp'n to Summ. J. Ex. L. However, the remaining

---

[5] Curiously, the location provided with the date is "Washington, D.C.," but, in the light most favorable to Plaintiff, she signed this Contract in Cameroon. Contract 2.

Defendants were not the ones who made her do housework, *id.* at 207:19 – 208:8, and although Plaintiff testified that she "was asked to" braid hair, Elat Dep. II 498:2–3, she did not identify who asked her.

Plaintiff claims that her access to food while working for the Ngoubenes was limited, Elat Dep. 229:22 – 231:3, and that, despite the contract language stating that she was to be paid an hourly rate of $9.38, she received no payment, other than small monetary gifts and $2,500 in 2008, which Plaintiff did not know why she received, *id.* at 190:9 – 191:11, 196:1. Indeed, Defendants provided no evidence of payment to Plaintiff other than occasional gratuitous payments. *See id.* Marie-Thérèse Ngoubene told Plaintiff not to leave the home unaccompanied, and although it was not the Ngoubene daughters' rule and they did not enforce it, they would "tell on" Plaintiff to their parents if she "didn't follow the rule." *Id.* at 271:3–21. Defendants told Plaintiff not to talk to strangers and told her that they, also, did not speak to strangers. *Id.* at 272:15 – 273:18, 380:5 – 382:11. Dany Ngoubene, in Plaintiff's opinion, "was really mean" to her by calling her a "bitch," telling her that she "didn't like kids in general," and "count[ing] the chocolate [wrappers] that [J.] had eaten," which made J. "sad." *Id.* at 257:1 – 258:1, 280:9 – 281:4. Plaintiff and her daughter had to live in an addition of the house that "didn't have [a] heating or cooling system" and, although Marie-Thérèse Ngoubene bought a space heater, it "wasn't working properly," and Mrs. Ngoubene did not replace it. *Id.* at 425:16 – 432:5.

Once, in October 2006, Plaintiff told Marie-Thérèse Ngoubene that she "wanted to leave," but that was "the only day" she asked to leave. Elat Dep. 101:6–17, 107:4–11, 110:22 – 111:1. Plaintiff testified that, after she "told Marie-Therese that [she] wanted to leave, . . . Caroline said, well, [you] can't leave the house because [you] don't have papers," and "Caroline used the term 'deported.'" *Id.* at 108:6–17, 109:1; *see id.* at 110:20 – 111:6 (same). Plaintiff

acknowledged that the October 2006 conversation was the only time Caroline Ngoubene mentioned deportation, and that Roxane Ngoubene and Dany Ngoubene never mentioned deportation. *Id.* at 109:14–19.

In May 2008, Plaintiff left the Ngoubene household. Pl.'s Opp'n to Summ. J. 5; Defs.' Mem. 63–64. The day she left, her uncle, Mr. Ngoubene asked her for her passport and Roxane Ngoubene searched Plaintiff's bags for the passport. Elat Dep. 274:15–22. However, Plaintiff already had given her passport to her husband, who had moved to the United States, for safekeeping. *Id.* at 275:19 – 276:1.

One month later, Plaintiff's attorney mailed a letter to Mr. Ngoubene, stating that Plaintiff "worked as an employee at [Mr. Ngoubene's] home for two years" without "receiv[ing] compensation," and asking Mr. Ngoubene to have his attorney contact Plaintiff's attorney. June 3, 2008 Ltr., Pl.'s Opp'n to Summ. J. Ex. O. After that, events began to happen that, in Plaintiff's view, were attempts by the Ngoubenes to dissuade her from filing her lawsuit. Pl.'s Opp'n to Summ. J. 6. In October 2010, Plaintiff's mother "started calling [her] regularly, which she didn't do before," insisting that Plaintiff "ha[d] to leave the state." Elat Dep. 320:9–12. Plaintiff testified that she learned through her mother that her aunt, Marie-Thérèse Ngoubene, was calling Plaintiff's mother regularly and threatening that the "embassy police" were "looking after [*sic*]" Plaintiff "[t]o deport her." *Id.* at 321:13 – 324:1.

Also, when Plaintiff, her husband, and a lawyer who was friends with Plaintiff's husband went to the Cameroonian embassy and the lawyer told the ambassador that Plaintiff was "a victim of slavery or forced labor," the ambassador "got very angry . . . at everybody in the room." *Id.* at 297:12 – 299:18. Plaintiff claims that Defendants' uncle, Guy Patrick Ewounkem, physically assaulted Plaintiff and her husband. Pl.'s Opp'n to Summ. J. 5–6. Another of

Defendants' uncles, Lucien Epah, after learning that Plaintiff planned to sue the Ngoubenes, "almost scream[ed]" at Plaintiff in a manner that she found threatening and told her that she had "to apologize to Mrs. Ngoubene." Elat Dep. 89:7 – 91:9. However, Plaintiff acknowledged that she had no evidence that either uncle acted on behalf of the Ngoubenes; she simply "believe[d] so . . . [b]ecause they were still in contact with the Ngoubenes." *Id.* at 91:17 – 92:19. Additionally, Plaintiff "had [her] car vandalized" and "someone tried to break in[to] [her] apartment," and in her view, "this always happened, every time [she] took a step forward with this procedure [her claim for unpaid wages]." *Id.* at 308:12–21. Once again, Plaintiff identified no direct evidence linking these events to her uncles, the Ngoubenes, or Defendants in particular. *Id.* at 310:5– 311:14. Plaintiff claims that, because of these actions, she did not have the "courage to file her claims" until October 2011. Pl.'s Opp'n to Summ. J. 6.

After leaving the Ngoubene household, Plaintiff applied for and received, on January 20, 2010, a T visa.[6] Notice of Action, Pl.'s Opp'n to Summ. J. Ex. B. Once Plaintiff secured the visa, she "believe[d] [she had] protection" from being deported. Elat Dep. 320:9 –321:12, 323:5 – 325:9; Elat Dep. II 475:1–9.

On October 13, 2011, Plaintiff filed an eighteen-count Complaint against her uncle, François Ngoubene, her aunt, Marie Thérèse Ngoubene, and her cousins, Caroline Ngoubene, Roxane Nbougene, and Dany Ngoubene, as well as their brother, Collins Rene Ngoussomo, alleging, *inter alia*, violations of the Federal Trafficking Victims Protection Reauthorization Act 18 U.S.C. §§ 1589, 1595 ("TVPRA"), and Maryland common law. Compl., ECF No. 1. Subsequently, Defendants filed a Motion to Dismiss, ECF No. 24, asserting diplomatic immunity, which the Court granted as to Defendants François Ngoubene, Marie-Thérèse

---

[6] The Department of Homeland Security issues a T visa to an eligible alien who "[is] or has been a victim of a severe form of trafficking in persons." 8 C.F.R. § 214.11(b).

Ngoubene, and Collins Ngoussomo, ECF No. 43, permitting Plaintiff the opportunity to file a second amended complaint against those defendants not entitled to diplomatic immunity, Caroline, Roxane, and Dany Ngoubene.

On June 4, 2012, Plaintiff filed a second amended complaint against Defendants Caroline, Roxane, and Dany Ngoubene, asserting five claims: violations of the TVPRA (Count I), false imprisonment and conspiracy to commit false imprisonment (Count II), quantum meruit (Count III), unjust enrichment (Count IV), and replevin (Count V). Plaintiff contends that Defendants are equitably estopped from raising an affirmative defense of statute of limitations with respect to her state claims, because Defendants purportedly used physical violence and threats of physical violence against Plaintiff and her family to dissuade her from filing suit. Second Am. Compl. ¶ 93.

Plaintiff asserts that "every professional who has reviewed her case has agreed that Ms. Elat is a victim of human trafficking, including the counselors and psychologists who examined and assisted Ms. Elat after her escape from the Ngoubene family, and the U.S. Department of Homeland Security, that awarded Ms. Elat a special visa for victims of human trafficking." Pl.'s Opp'n to Summ. J. 2. The two individuals who purportedly "examined and assisted" Ms. Elat were psychotherapist Kathleen Toellner, Psy.D. and human trafficking expert Florence Burke. *See* K. Toellner Ltr., Pl.'s Opp'n to Summ. J. Ex. A; Burke Report, Pl.'s Opp'n to Summ. J. Ex. C. This evidence is discussed in Part II, below.

## II. EVIDENCE CONSIDERED ON SUMMARY JUDGMENT

In reviewing a motion for summary judgment, I consider "particular parts of materials in the record" to which the parties have cited, unless a party "object[s] that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence," in

which case I consider the merits of the objection and only consider such facts if I conclude that they are supported by facts that could be "presented in a form that would be admissible in evidence" and overrule the objection. Fed. R. Civ. P. 56(c)(1)(A), (2). Here, Defendants have objected to the admissibility of Ms. Burke's testimony, with regard to which they filed a Motion in Limine; the T visa; and Ms. Toellner's letter. *See* Defs.' Summ. J. Reply 4–5.

### A.     Motion in Limine as to Ms. Burke's Testimony

Plaintiff designated Florence Burke as an expert witness. Pl.'s Opp'n to Summ. J. 2 n.3. Ms. Burke has a master's degree in clinical psychology and began but never completed a Ph.D. program in clinical psychology. Burke Curriculum Vitae, Pl.'s Opp'n to Mot. in Limine Ex. C, ECF No. 156-3. She has worked with and interviewed approximately 300 human trafficking victims over the course of fifteen years and provided training and lectures on human trafficking to a wide range of audiences. Burke Report 7–9, Defs.' Mot. in Limine Ex. 2, ECF No. 159-2.

In her Expert Report, Ms. Burke expressed the opinion that "Ms. Elat was a victim of human trafficking" who "was brought to the United States under false pretenses and compelled to perform domestic services against her will," while "[c]oercion and threats were used to maintain control over [her]." Burke Report 1. Ms. Burke expressed the opinion that "the defendants collaborated with their parents to prevent Ms. Elat from forming outside relationships," although she did not identify any facts to support this opinion. *Id.* at 4. In Ms. Burke's opinion, "the climate of fear established by the Ngoubene family was effective in keeping Ms. Elat in their household," and "the Ngoubene family engaged in . . . manipulation" typical of traffickers "to keep the worker from escaping or asking to leave." *Id.* at 5. Additionally, Ms. Burke opined that "Ms. Elat suffered and continues to suffer ongoing

emotional distress from the isolation, loss of certain freedoms, lack of social and familial support and control over her life and work." *Id.* at 1.

Ms. Burke stated that she will testify generally about "the effect of this type of social isolation on a young woman"; "the patterns of coercion and threats that are typically present in situations involving the exploitation of foreign workers"; "the effects that lack of familiarity with United States laws, customs, and norms, little or no access to information or support outside the employer's family, and physical isolation have on the behavior of migrant workers"; and "how it is common for traffickers to exert control and foster dependency in a variety of ways that are both subtle and overt." *Id.* at 4–5. She also stated that she will testify about the effects that Plaintiff's living and working conditions had on her specifically and "how the allegations of Ms. Elat fit within similar profiles of worker exploitation and human trafficking cases." *Id.*

Defendants challenge Ms. Burke's conclusion that Plaintiff was a victim of human trafficking and seek "to preclude Plaintiff's expert witness, Florence R. Burke, from testifying at trial." Defs.' Mot. in Limine 1; *see* Defs.' Summ. J. Reply 4 & n.15. Defendants particularly ask the Court to exclude Ms. Burke's testimony that "Plaintiff was the victim of human trafficking as defined by 18 U.S.C. § 1589(a)" and her "opinions regarding mental and emotional harm that [Plaintiff] allegedly suffered as a result of being the victim of human trafficking." Defs.' Mot. in Limine 1. Yet, in their Reply, Defendants broaden their objection to Ms. Burke's testimony, arguing that it "should be excluded in its entirety." Defs.' Reply to Mot. in Limine 9. In their view, Ms. Burke's "individual opinions are directly related to Ms. Burke's general opinion that Plaintiff 'was a victim of human trafficking'" and that "Plaintiff has suffered emotional distress and [that her victimization was] the cause of the alleged emotional distress." *Id.* at 10.

Defendants challenge the admissibility of Ms. Burke's opinion that Plaintiff was a victim of human trafficking on the bases that it is a legal conclusion and an improper credibility determination, and that it is based on insufficient facts. Defs.' Mot. in Limine 3–10. They challenge the admissibility of her opinion that Plaintiff suffered emotional distress on the grounds that Ms. Burke lacked specialized knowledge; her opinion would not be helpful to the jury; and her opinion is inadmissible as lay testimony. *Id.* at 10–13.

### 1. *Admissibility of expert testimony*

"A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise" if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. Additionally, "[a]n opinion is not objectionable just because it embraces an ultimate opinion." Fed. R. Evid. 704(a).

### 2. *Opinion about Plaintiff as a victim of human trafficking*

#### a. Basis of opinion

Defendants argue that "Ms. Burke's opinion lacks a sufficient factual basis" for her to testify about whether Plaintiff was a victim of human trafficking because Ms. Burke "made no attempt to verify any of Plaintiff's allegations or to even consider any contradictory evidence." Defs.' Mot. in Limine 9. Defendants contend that Ms. Burke based her conclusions "primarily on [a December 2012] interview" she conducted of Plaintiff, without "investigat[ing] the

accuracy of any of the statements Plaintiff made to her during their interview," such as by "question[ing] any other individuals involved in the case." *Id*. at 2. They maintain that "Ms. Burke's understanding of the 'facts[]' . . . is based almost entirely on . . . her complete acceptance of every factual allegation made by Plaintiff, and her rejection of every factual allegation made by the Defendants." *Id*. at 6. Acknowledging that Ms. Burke reviewed Caroline Ngoubene's deposition transcript, they argue that Ms. Burke "simply discounted it." *Id.* at 9.

According to Defendants, Ms. Burke testified that she "relied" only on Plaintiff's complaint "for factual information in formulating her opinions." Defs.' Reply 4. Indeed, Ms. Burke testified that, while she "review[ed]" relevant documents beyond the Complaint, the factual information she reviewed that "supports or is a basis for [her] opinion that [Plaintiff] is a victim of human trafficking in terms of the facts of what happened in this case" was limited to Plaintiff's interview and her Complaint. Burke Dep. 203:19 – 207:18. Defendants insist that 'there is a critical distinction between [Ms. Burke] having *reviewed* certain materials and her having *relied* on those materials in reaching her opinions." *Id.*

> Plaintiff insists that Ms. Burke
>
> thorough[ly] review[ed] . . . materials, including: court filings from Ms. Elat and from Defendants; the records from Break the Chain Campaign, which provided services to Ms. Elat after her escape from the Ngoubenes; the records of Dr. Kathleen Toellner, who provided counseling to Ms. Elat after her escape from the Ngoubenes; over one hundred e-mails; dozens of photographs provided by Defendants; the depositions of Ms. Elat and of Defendant Caroline Ngoubene; and a five and one-half hour in person interview with Ms. Elat.

Pl.'s Opp'n to Mot. in Limine 3. She contends that Ms. Burke "reliably applied" her review of the facts "through the lens of fifteen years' experience with human trafficking and thirty years' experience with psychological counseling." *Id*. at 4. In Plaintiff's view, "the quality of material reviewed may be fodder for cross-examination but is not a reason for excluding the expert's

testimony." *Id.* at 5–6. Plaintiff also contends that "[r]eliable application merely requires that the witness articulate why her specialized knowledge, training, or experience leads to the conclusion reached." *Id.* at 6. She asserts that Ms. Burke formed her conclusions by "eliciting information based on decades of work with trauma and human trafficking victims" and "comparing that information to her wealth of experience in the field." *Id.*

Ms. Burke stated in her Expert Report that she considered Plaintiff's Second Amended Complaint, the filings regarding Defendants' Motion to Dismiss, Defendants' responses to Plaintiff's interrogatories and document production requests, her interview of Plaintiff, more than 200 pages of documents produced in discovery, and various publications about human trafficking to reach the opinions she gave in her Expert Report. Burke Report 10–11. Additionally, in her First Supplement to Expert Report, she stated that she reviewed more than 100 documents and the deposition transcripts of Plaintiff and Caroline Ngoubene. Burke Report Supp. 1, Pl.'s Opp'n to Mot. in Limine Ex. E, ECF No. 156-5; *see also* Burke Dep. 298:1–17 (testifying that she "considered" Caroline Ngoubene's deposition testimony). Ms. Burke concluded that "these documents are consistent with and support the findings stated in [her] Expert Report." Burke Report Supp. 1. In sum, it appears that there are few, if any, documents in this case that Ms. Burke has not considered. Accordingly, Ms. Burke's testimony is "based on sufficient facts or data." Fed. R. Evid. 702(b).

b.      Legal conclusions

According to Defendants, "Ms. Burke's opinion that Plaintiff was the victim of 'human trafficking' . . . . is purely a legal conclusion" because it "amounts to nothing more than her own assessment of the evidence and determination that it fits the elements of the statute at issue." Defs.' Mot in Limine 5. In their view, although an opinion on an "'ultimate issue'" may be

admissible, Ms. Burke's opinion is not admissible because it will not "'help the trier of fact to understand the evidence or to determine a fact in issue.'" *Id.* at 3 (quoting Fed. R. Evid 704(a); Fed. R. Evid. 702(a)). They insist that "Ms. Burke's definition of 'human trafficking' tracks the elements of [18 U.S.C. § 1589(a)]." *Id.* at 5.

Noting that "'[a]n opinion is not objectionable just because it embraces an ultimate issue,'" Plaintiff counters that Ms. Burke's expert testimony uses a term, human trafficking, that "has the same meaning in the law as in the vernacular," and therefore is helpful to the jury. Pl.'s Opp'n to Mot. in Limine 8 (quoting Fed. R. Evid. 704(a)). On this basis, she contends that Ms. Burke's testimony is not "an improper legal conclusion" and is admissible because her "expert testimony on the phenomena [of human trafficking] will only assist the jury to understand it." *Id.* at 7–8.

As a starting point, "[t]estimony that 'states a legal standard or draws a legal conclusion[]' . . . is inadmissible." *In re Titanium Dioxide Antitrust Litig.*, No. RDB-10-318, 2013 WL 1855980, at *3 (D. Md. May 1, 2013) (quoting *United States v. McIver*, 470 F.3d 550, 561–62 (4th Cir. 2006)). Put another way, "'opinions which would merely tell the jury what result to reach' are inadmissible." *Id.* at *4 (quoting Fed. R. Evid. 704 advisory committee's note); *see Offill*, 666 F.3d at 175 (such testimony "does not help the jury . . . because it 'supplies the jury with no information other than the witness's view of how the verdict should read'" (quoting *Weinstein's Federal Evidence* § 704.04[2][a] (2d ed. 2003))); *United States v. Chapman*, 209 F. App'x 253, 269 (4th Cir. 2006) ("'Generally, the use of expert testimony is not permitted if it will usurp either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it. When an expert undertakes to tell the jury what result to reach, this does not aid the jury in making a decision,

but rather attempts to substitute the expert's judgment for the jury's.'" (quoting *United States v. Duncan*, 42 F.3d 97, 101 (2d Cir. 1994) (citations and internal quotation marks omitted))).

Nonetheless, "[a]n opinion is not objectionable just because it embraces an ultimate issue." Fed. R. Evid. 704(a). Thus, an expert witness's opinion testimony may concern "'questions of fact that are committed to resolution by the jury.'" *In re Titanium Dioxide Antitrust Litig.*, No. RDB-10-318, 2013 WL 1855980, at *3 (D. Md. May 1, 2013) (quoting *United States v. McIver*, 470 F.3d 550, 561 (4th Cir. 2006)). As a result, "[t]he line between a permissible opinion on an ultimate issue and an impermissible legal conclusion is not always easy to discern." *McIver*, 470 F.3d at 562. The Fourth Circuit explained:

> We identify improper legal conclusions by determining whether "the terms used by the witness have a separate, distinct and specialized meaning in the law different from that present in the vernacular." For example, courts have held inadmissible testimony that a defendant's actions constituted "extortion," that a dog bite constituted "deadly force," that defendants held a "fiduciary" relationship to plaintiffs, and that a product was "unreasonably dangerous."

*Id.* (citations omitted); *see In re Titanium Dioxide Antitrust Litig.*, 2013 WL 1855980, at *3 (quoting *McIver*). Testimony that "involves the use of terms with considerable legal baggage . . . nearly always invades the province of the jury." *United States v. Perkins*, 470 F.3d 150, 158 (4th Cir. 2006). When a witness provides legal conclusions in response to counsel's questioning, the court also considers whether the question itself "calls for an improper legal conclusion," by "consider[ing] first whether the question tracks the language of the legal principle at issue or of the applicable statute, and second, whether any terms employed have specialized legal meaning." *United States v. Barile*, 286 F.3d 749, 760 (4th Cir. 2002). Central to the inquiry of whether an expert witness's opinion testimony on the ultimate issue is admissible is whether it will be helpful to the jury. *Perkins*, 470 F.3d at 157 ("The touchstone of admissibility of testimony that goes to the ultimate issue . . . is helpfulness to the jury."); *see United States v. Offill*, 666 F.3d

168, 175 (4th Cir. 2011) ("The touchstone of the rule is whether the testimony will assist the jury."); Fed. R. Evid. 702(a).

Here, nothing in the submissions filed by Plaintiff or the Defendants, nor my own research, suggests that "human trafficking" has a meaning other than its colloquial meaning, and therefore Ms. Burke's testimony is not necessarily an "improper legal conclusion." *See McIver*, 470 F.3d at 562. Yet, Defendants also argue that Ms. Burke's opinion is not admissible under Rule 702, even if it is otherwise admissible under Rule 704 as an opinion on the ultimate issue, because it is "an improper determination of credibility." Defs.' Mot. in Limine 6. Defendants contend that Ms. Burke testified that "she is able to make credibility assessments" and "she was able to determine that Plaintiff's allegations are truthful." *Id.*

Plaintiff counters that "Ms. Burke's opinion is not an impermissible comment on credibility because it does more than simply attack or bolster credibility." Pl.'s Opp'n to Mot. in Limine 9. In Plaintiff's view, Mr. Burke's "testimony is offered to assist the jury in understanding how Ms. Elat's case is consistent with the patterns of trafficking she has studied and observed over the last fifteen years." *Id.*

*United States v. Allen*, 716 F.3d 98 (4th Cir. 2013), although factually inapposite, is informative nonetheless. There, the defendant "moved to call a criminal defense expert to help explain the potential significance of all of the indicted codefendants reaching plea agreements with the government," and the district court denied his motion in limine. *Id.* at 101. Reasoning that the defendant "wanted to introduce expert testimony solely for the purpose of undermining the credibility of the codefendant witnesses," the Fourth Circuit affirmed. *Id.* at 105–06. The appellate court stated: "This is not the function of an expert," as "'expert opinions that constitute evaluations of witness credibility, even when such evaluations are rooted in scientific or

technical expertise, are inadmissible under Rule 702.'" *Id.* (quoting *Nimely v. City of New York*, 414 F.3d 381, 398 (2d Cir. 2005)).  Additionally, the Fourth Circuit said that the subject matter of the proffered testimony was "not an issue of fact that would be better explained by an expert." *Id.*

Here, Ms. Burke testified that she is "a good interviewer" who "know[s] by and large when a story holds together, and when it does not," and that she "use[s] every bit of knowledge and experience [she has] in trying to get at the essence of what someone is telling [her] and the truthfulness of it or not."  Burke Dep. 100:3–10.  She said that she was "able to determine if [Plaintiff was] telling [her] the truth about what she says happened to her" based on her "knowledge of the issue, the way [she] ask[s] questions, [and] the way [she] elicit[s] information."  *Id.* at 337:8–16.  Ms. Burke admitted that she "believed what Ms. Elat told [her] about th[e] events, and [she] did not believe what . . . Caroline had said about those events."  *Id.* at 300:12–21.  Simply put, Ms. Burke's explanation of her methodology and the opinions she bases on it demonstrate that her evaluation of the truthfulness of Plaintiff's version of the underlying events as compared to the Defendants' is little different from the way that juries themselves determine credibility from conflicting testimony.  Plaintiff has not shown that Ms. Burke's proffered opinion testimony will be helpful to the jury.  *See* Fed. R. Evid. 702(a); *Allen*, 716 F.3d at 105–06.  Therefore, insofar as Ms. Burke's testimony is one assessing credibility of the parties, it is inadmissible, and will not be considered on summary judgment.  *See* Fed. R. Evid. 702(a); Fed. R. Civ. P. 56(c)(2).

This means that the opinions Ms. Burke reached based on her determination that Plaintiff told her the truth and Caroline Ngoubene was untruthful in her deposition are inadmissible and may not be considered by a jury.  Such inadmissible opinions include Ms. Burke's opinion that

"Ms. Elat was a victim of human trafficking" who "was brought to the United States under false pretenses and compelled to perform domestic services against her will" while "[c]oercion and threats were used to maintain control over [her]," Burke Report 1; that "the defendants collaborated with their parents to prevent Ms. Elat from forming outside relationships," *id.* at 4; that "the climate of fear established by the Ngoubene family was effective in keeping Ms. Elat in their household," and that "the Ngoubene family engaged in . . . manipulation" typical of traffickers "to keep the worker from escaping or asking to leave," *id.* at 5. It also includes Ms. Burke's proposed testimony about the effects that Plaintiff's living and working conditions had on her and "how the allegations of Ms. Elat fit within similar profiles of worker exploitation and human trafficking cases." *Id.* at 4–5.

However, other proffered testimony from Ms. Burke could help a jury determine whether the facts of this case are consistent with human trafficking. *See* Fed. R. Evid. 702(a). Ms. Burke stated that she will testify generally about "the effect of this type of social isolation on a young woman"; "the patterns of coercion and threats that are typically present in situations involving the exploitation of foreign workers"; "the effects that lack of familiarity with United States laws, customs, and norms, little or no access to information or support outside the employer's family, and physical isolation have on the behavior of migrant workers"; and "how it is common for traffickers to exert control and foster dependency in a variety of ways that are both subtle and overt." *Id.* at 4–5. This expert testimony would be helpful to a jury and therefore is admissible and will be considered on summary judgment and admitted at trial.[7] *See* Fed. R. Evid. 702(a); Fed. R. Civ. P. 56(c)(2); *Perkins*, 470 F.3d at 157; *Offill*, 666 F.3d at 175.

---

[7] Ms. Burke certainly has sufficient "specialized experience" to be qualified as an expert in human trafficking. *See* Fed. R. Evid. 702(a). "Rule 702 does not require that a court rely solely on an individual's education to qualify him as an expert. Rather, 'the text ... expressly

### 3. Opinion about Plaintiff suffering emotional distress

Defendants challenge Ms. Burke's qualifications to express an opinion regarding emotional injuries that Plaintiff claims, noting that she "is not a licensed psychologist or therapist," although she "at one time [was] a licensed therapist in the state of California," and she does not claim that she conducted an "'examination'" or "performed any diagnosis of the Plaintiff." Defs.' Mot. 11 & n.2. They challenge the admissibility of her testimony and seek to preclude Ms. Burke from offering her opinion "regarding mental and emotional harm that [Plaintiff] allegedly suffered as a result of being the victim of human trafficking" because it "is not based on any scientific, technical, or specialized knowledge and it would not be helpful to the jury." *Id.* at 1, 10–11. Defendants further argue that "Ms. Burke's testimony as to how she arrived at her opinion—by listening to Plaintiff talk and observing her demeanor—is precisely the role of the jury at trial." *Id.* at 12.

In Plaintiff's view, Ms. Burke has "specialized knowledge" stemming from "[h]er education and experience in clinical psychology," because she "is a trained psychologist with multiple degrees, thirty years of experience with trauma victims in general, including in clinical

---

contemplates that an expert may be qualified on the basis of experience.'" *United States v. Lobo-Lopez*, 468 F. App'x 186, 190 (4th Cir. Mar. 1, 2012) (quoting *United States v. Wilson*, 484 F.3d 267, 274 (4th Cir. 2007)). Ms. Burke has "fifteen years of experience working with cases of human trafficking and modern day slavery" and "over thirty years of experience working in mental health settings with a specialty in trauma and its[] impact." Burke Report 7. She has "provided training on human trafficking to federal prosecutors and investigators, . . . law enforcement officers, foreign officials, lawyers, social service providers, and the general public," as well as "criminal justice system actors in a variety of countries." *Id.* at 8–9. Additionally, she founded and directed a "crime victim service agency" where she "oversaw and supervised services for approximately three hundred victims of Human Trafficking and Modern Day slavery." *Id.* at 8. She has "testified at hearings before the U.S. House of Representatives Judiciary Committee, the U.S. House of Representatives House Oversight and Reform Committee, and the Equal Employment Opportunity Commission on the issues of worker exploitation and trafficking." *Id.* Ms. Burke has conducted "extensive interviews with hundreds of victims." *Id.* at 9. She has "received advanced training in trauma, as well as in the symptom clusters of both Post Traumatic Stress Syndrome and ongoing stress and Anxiety Disorders." *Id.*

settings, and fifteen years dealing with human trafficking victims in particular." Pl.'s Opp'n to Mot. in Limine 11. Plaintiff insists that Ms. Burke's interview of Plaintiff was sufficient for her to form an opinion because she reviewed the record and conducted the interview "in a particular manner to elicit certain information," and did so "against the backdrop of thirty years of psychological education and experience." *Id*.

Plaintiff argues that Ms. Burke is qualified to testify as an expert because she "has been certified as an expert in human trafficking and its psychological toll" and "has testified as an expert at trial and authored expert reports for a half-dozen human trafficking cases." *Id*. at 5. Plaintiff cites two cases in which Ms. Burke has testified as an expert: *Doe v. Howard*, No. 1:11-cv-1105, 2012 WL 3834867, at *4 n.3 (E.D. Va. Sept. 4, 2012); and *Chellen v. John Pickle Co.*, 446 F. Supp. 2d 1247 (N.D. Okla. 2006), *amending and superseding* 434 F. Supp. 2d 1069 (N.D. Okla. 2006). In *Howard*, a trafficking case, Ms. Burke testified that the plaintiff's severe emotional trauma was typical for someone subject to the abuse that the plaintiff experienced. 2012 WL 3834867, at *3. In *Chellen*, which was not a trafficking case, Ms. Burke testified about the derogatory names the plaintiffs were called and she equated the plaintiffs to trauma victims. 446 F. Supp. 2d at 1266, 1268–69. To the extent that these two courts—the only courts that Plaintiff has identified in which Ms. Burke's testimony has been admitted as expert testimony—found Ms. Burke's expert testimony to be admissible with regard to the plaintiffs' alleged emotional distress, I note that neither case is controlling authority, and I respectfully disagree.

Although Ms. Burke has a master's degree in psychology and has completed some coursework toward a Ph.D., she is not a licensed psychologist or licensed therapist. Burke Dep. 11:22 – 12:11, 18:18 – 19:12, Pl.'s Opp'n to Mot. in Limine Ex. A, ECF No. 156-1. Indeed, she

is not a psychologist.  *See What is psychology*, www.apa.org ("Psychologists have doctoral degrees."); *Definition of "Psychology,"* www.apa.org ("Psychology is a doctoral-level profession."); *Careers in Psychology: The job outlook*, www.apa.org ("By APA policy and licensing laws, the term psychologist is reserved for individuals with doctoral education and training.");[8] *see, e.g.*, Md. Code Ann., Health Occ. § 18-402(b) (Unless the Maryland Health Occupations Article so permits, "a person may not use as a title or describe the services the person provides by use of the words 'psychological', 'psychologist', or 'psychology'.").

As Ms. Burke stated, she interviewed Plaintiff but did not examine her, Burke Dep. 117:3 – 118:12, such that she was not giving a "diagnosis" of "emotional distress," but rather "an opinion essentially as to [Plaintiff's] mental health," *id.* at 209:21 – 210:13.  According to Ms. Burke, "[a] diagnosis is something that is a formal process, and it's based on guidelines put out by the Diagnostical [*sic*] and Statistical Manual for psychologists," and a person conducting a diagnosis "look[s] at symptoms that are presented to them in a structured interview that is done specifically for this reason." *Id.* at 210:117 – 211:4.  Ms. Burke said that, in contrast, she reached her conclusions "[a]s someone who has worked many years clinically," by "noticing the demeanor of someone when [she is] talking to them" and "noticing how they respond to certain questions" and "looking at their . . . affect as they are reporting certain situations." [9]  *Id.* at 211:9–15.  This is a distinction without a difference.

Of course, Ms. Burke could not have conducted a psychological examination of Plaintiff without a license to practice psychology.  *See Careers in Psychology: Getting ready to work in*

---

[8] I take judicial notice of the content of the website of the American Psychological Association pursuant to Fed. R. Evid. 201.

[9] Curiously, Ms. Burke cites the "DSM-IV-TR, 4th Edition.  Diagnostic and Statistical Manual of Mental Disorders" as part of the "information that was reviewed in order to reach [her] opinion." Burke Report 10–11.

*psychology*, www.apa.org ("You must be licensed as a psychologist for the independent practice of psychology anywhere in the United States or Canada. Before granting you permission to take the licensing exam, the state licensing board will review your educational background. A doctoral degree does not automatically make you eligible to sit for the licensing exam; requirements vary from state to state. States require, at a minimum, that the doctorate be in psychology or a field of study 'primarily psychological in nature' and that it be from a regionally accredited institution."); *see, e.g.*, Md. Code Ann., Health Occ. § 18-401(a) (With exceptions not relevant here, "a person may not practice, attempt to practice, or offer to practice psychology in this State unless licensed by the Board."); *see also, e.g.*, Health Occ. § 18-302 (To have a license to practice psychology in Maryland, "[t]he applicant shall have a doctoral degree in psychology . . . ."). Moreover, Plaintiff has not shown a basis for Ms. Burke's understanding of emotional distress specifically, as opposed to human trafficking in general, other than Ms. Burke's incomplete doctoral coursework. Consequently, Ms. Burke's opinion is based solely on her lay observations as an interviewer and not on specialized knowledge of emotional distress. Therefore, Ms. Burke's opinion testimony on Plaintiff's alleged emotional distress is inadmissible and will not be considered on summary judgment or at trial. *See United States v. Allen*, 716 F.3d 98, 105 (4th Cir. 2013) ("[I]n order for expert testimony to be admissible, . . . the testimony must involve scientific, technical, or other specialized knowledge . . . ."); Fed. R. Evid. 702(a); Fed. R. Civ. P. 56(c)(2).

**B.      T Visa**

Defendants challenge the admissibility of Plaintiff's T visa as evidence that she was a victim of human trafficking, noting that "no one from the U.S. Immigration Service has been named as an expert." Defs.' Summ. J. Reply 4. Defendants assert that Plaintiff received the T

visa "as a result of a non-adversarial proceeding in reliance on an affidavit submitted by plaintiff in which she made statements that she specifically disavowed in this proceeding," such as that the Ngoubenes physically abused her and Mr. Ngoubene "threatened to kill her husband." *Id.* at 5. Indeed, in her T visa application, Plaintiff stated that she experienced "physical and emotional abuse" including being "slapped by [her] aunt" and "beaten," "brutally" restrained, and "pushed" by Mr. Ngoubene, and that Mr. Ngoubene "vowed to have [Plaintiff's husband] killed." Application for Asylum 12–14, Defs.' Unredacted Summ. J. Reply Ex. 2, ECF No. 145-2.[10] Yet, in her deposition testimony, Plaintiff answered that none of the remaining Defendants nor "any members of their family who lived in that house . . . ever assault[ed] [her]," with "assault" defined as "hit, kick, strike, or otherwise physically touch [her] in an offensive or harmful way." Elat Dep. 20:11–20. Plaintiff did not seek leave of court to dispute these contentions by Defendants in their Reply memorandum. *See* Loc. R. 105.2.a.

Expert testimony "must rest on a reliable foundation." *Daubert v. Merrell Dow Pharma.*, 509 U.S. 579. 597 (1993); *see Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999) (extending *Daubert* to non-scientist expert testimony). Plaintiff offers the one-page T visa as a standalone document. Preliminarily, the T visa is not admissible unless authentic. Fed. R. Evid. 901(a). It is not sealed and signed, signed and certified, or certified, so it is not self-authenticating. *See* Fed. R. Evid. 902(1), (2) & (3). Nor has Plaintiff offered extrinsic evidence of its authenticity. While, at this stage, all Plaintiff must do is show that the document *could be* authenticated at trial, *see* Fed. R. Civ. P. 56(c)(2); *Ridgell v. Astrue*, DKC-10-3280, 2012 WL 707008, at *9 (D. Md. Mar. 2, 2012) (citing *Foreword Magazine, Inc. v. OverDrive, Inc.*, No.

---

[10] Defendants removed this exhibit in its entirety in their redacted filing. *See* ECF No. 160-2. Plaintiff's Application for Asylum is hereby unsealed to the extent that it is discussed in this Memorandum Opinion.

1:10–cv–1144, 2011 WL 5169384, at *2 (W.D. Mich. Oct. 31, 2011)) (footnotes omitted), she has not made this showing. Moreover, were I to assume its authenticity, Plaintiff has not established that the T visa would be admissible under Rule 803(8)(A)(i)–(iii) to prove its substantive contents which, even if assumed to be admissible, do not state any matters observed while under a legal duty to report, Fed. R. Evid. 803(8)(A)(ii), or factual findings from a legally-authorized investigation, Fed. R. Evid. 803(8)(A)(iii). The T visa simply states that Plaintiff's application for T-1 Nonimmigrant classification has been granted for a period of four years. It expresses no conclusions or findings that Plaintiff has been a victim of trafficking, as Plaintiff contends, although the application for a T-1 classification does assert Plaintiff's claim to be a trafficking victim.

To receive a T visa, an individual submits to U.S. Customs and Immigration Services ("the Service") an application accompanied by, *inter alia*, "[e]vidence demonstrating that the applicant is a victim of a severe form of trafficking in persons." 8 C.F.R. § 214.11(d)(1). Such evidence must "fully establish[] eligibility for each element of the T nonimmigrant status to the satisfaction of the Attorney General." *Id.* § 214.11(f). Notably, "[t]he determination of what evidence is credible and the weight to be given that evidence shall be within the sole discretion of the Service." *Id.* § 214.11(f)(3). The Service "issue[s] a written decision granting or denying the application" based on its "de novo review of all evidence submitted." *Id.* § 214.11(*l*)(1), (3). Thus, the Service relies solely on the information reported by the purported victim, without the benefit of an adversarial proceeding or input from the alleged traffickers. *See id.* Although in individual cases this process may be a reliable method for determining whether to grant a T-1 visa, Defendants contend that reaching a decision without giving the alleged offenders the opportunity to present any evidence or challenge the alleged victim's evidence is not a "reliable

method" for purposes of this proceeding, as can be seen in the discrepancies between Plaintiff's T visa application and her deposition testimony. Thus, even if assumed to be authentic and to meet the requirements of substantive admissibility under Rule 803(8)(A), Plaintiff failed to demonstrate, given her deposition testimony that sharply contradicted her affidavit supporting her T-1 application, that the T visa is a public record based on information or circumstances demonstrating trustworthiness. Fed. R. Evid. 803(8)(B). And, if untrustworthy under Fed. R. Evid. 803(8)(B), the T visa is not appropriate for reliance by Ms. Burke in support of her expert opinion. *See* Fed. R. Evid. 703. As noted, "'expert opinions that constitute evaluations of witness credibility, even when such evaluations are rooted in scientific or technical expertise, are inadmissible under Rule 702.'" *United States v. Allen*, 716 F.3d 98, 105–06 (4th Cir. 2013) (quoting *Nimely v. City of New York*, 414 F.3d 381, 398 (2d Cir. 2005)). Therefore, the T visa will not be considered on summary judgment. *See* Fed. R. Civ. P. 56(c)(2). Whether it may be admitted at trial remains to be seen.

### C. Dr. Toellner's Letter

In her April 28, 2009 letter to Cecile H. Nantchouang, Esquire, regarding "the treatment that [Dr. Toellner] and the Women's Center ha[d] been providing to Mrs. Elat," Dr. Toellner stated that Plaintiff "came to the United States to work for a family affiliated with the Cameroonian government," and she experienced "physical[] and verbal[] abuse by her employer." K. Toellner Ltr. 1. Defendants note that Plaintiff has not named Dr. Toellner as an expert, and on that ground, challenge the admissibility of her letter as evidence that Plaintiff was a victim of human trafficking. Defs.' Summ. J. Reply 4. Additionally, Defendants point to Dr. Toellner's deposition testimony that she assumed that Plaintiff "was a victim of human trafficking because Break the Chain had referred her over and said so" and because Plaintiff had

used the terms slavery and human trafficking. Defs.' Summ. J. Reply 5. Notably, Dr. Toellner did not express an opinion that Plaintiff was a victim of human trafficking, that Defendants obtained Plaintiff's labor through threats of serious harm or abuse of the legal process or otherwise forced Plaintiff to work for them, or that Defendants prevented Plaintiff from timely filing suit. K. Toellner Ltr. Therefore, Dr. Toellner's letter is inadmissible as evidence that Plaintiff was a victim of human trafficking and will not be considered in connection with resolving Defendants' Motion for Summary Judgment.

## III. MOTION TO AMEND

Plaintiff states that she "is no longer pursuing her claims of false imprisonment (Count II) and quantum meruit (Count III)." Pl.'s Opp'n to Summ. J. 1 n.2. Also, she "is no longer pursuing the Action of Replevin" (Count V) "to recover her Cameroonian ID card" because François Ngoubene's attorney returned the ID card to Plaintiff. Defendants assert that Plaintiff "essentially conceded" her claims for false imprisonment and quantum meruit "by agreeing not to pursue those claims any further," and she "dismissed her claim for replevin." Defs.' Mem. 2 n.2. Nonetheless, Defendants "request that this Court grant their motion for summary judgment in its entirety," even as to Counts II, II and V that Plaintiff has abandoned. *Id.* at 20.

The proper mechanism for a plaintiff to withdraw some, but not all, claims is to file a motion to amend pursuant to Fed. R. Civ. P. 15. *See Skinner v. First Am. Bank of Va.*, 64 F.3d 659 (Table), 1995 WL 507264, at *2 (4th Cir. 1995) ("Because Rule 41 provides for the dismissal of *actions*, rather than *claims*, Rule 15 is technically the proper vehicle to accomplish a partial dismissal."); *Young v. United Parcel Serv.*, No. DKC-08-2586, 2011 WL 665321, at *7 (D. Md. Feb. 14, 2011) (stating that "a plaintiff wishing to dismiss one count of a multi-count suit should ordinarily look to Rule 15, which governs amendments to pleadings"; noting that

"Rule 41(a), which addresses voluntary dismissals, applies only when a party seeks to dismiss an entire action, not merely one claim or count").  Therefore, I will construe Plaintiff's concession that she is abandoning Counts II, III, and V in her Opposition to Summary Judgment to incorporate a motion to amend.  *See* Fed. R. Civ. P. 1; *see also Monge v. Portofino Ristorante*, 751 F. Supp. 2d 789, 792 n.1 (D. Md. 2010) (explaining that Rule 1 instructs the Court "not [to] exalt form over substance"); *Hall v. Sullivan*, 229 F.R.D. 501, 504 (D. Md. 2005) (same).

Whether to grant a motion for leave to amend is within this Court's discretion.  *Foman v. Davis*, 371 U.S. 178, 182 (1962).  Rule 15(a)(2) typically provides the standard for whether to grant a motion for leave to amend that a plaintiff files more than twenty-one days after defendants file a responsive pleading or motion to dismiss.  *See id.*; Fed. R. Civ. P. 15(a)(2).  However, when the plaintiff moves to amend after the deadline established in the scheduling order for doing so, as Plaintiff does here, Rule 16(b)(4) becomes the starting point in the Court's analysis. *CBX Techs., Inc. v. GCC Techs., LLC*, No. JKB-10-2112, 2012 WL 3038639, at *3 (D. Md. July 24, 2012).  Thus, "once the scheduling order's deadline for amendment of the pleadings has passed, a moving party first must satisfy the good cause standard of Rule 16(b); if the moving party satisfies Rule 16(b), the movant then must pass the tests for amendment under [Rule] 15(a).'"  *Id.* (quoting *Odyssey Travel Ctr., Inc. v. RO Cruises, Inc.*, 262 F. Supp. 2d 618, 631 (D. Md. 2003)); *see Nourison Rug Corp. v. Parvizian*, 535 F.3d 295, 298 (4th Cir. 2008).

""[G]ood cause" means that scheduling deadlines cannot be met despite a party's diligent efforts.'" *CBX Techs., Inc.*, 2012 WL 3038639, at *4 (quoting *Potomac Elec. Power Co. v. Elec. Motor Supply, Inc.*, 190 F.R.D. 372, 375 (D. Md. 1999) (citation omitted)).  The Court focuses "less . . . on the substance of the proposed amendment and more . . . [on] the timeliness of the motion to amend 'and the reasons for its tardy submission.'" *Id.* (quoting *Rassoull v.*

*Maximus, Inc.*, 209 F.R.D. 372, 373–74 (D. Md. 2002)). Specifically, the Court considers whether the moving party acted in good faith, the length of the delay and its effects, and whether the delay will prejudice the non-moving party. *Tawwaab v. Va. Linen Serv., Inc.*, 729 F. Supp. 2d 757, 768-69 (D. Md. 2010).

If the Court concludes that the plaintiff had good cause for moving to amend after the deadline has passed, then, pursuant to Rule 15(a)(2), "[t]he court should freely give leave [to amend] when justice so requires." The Court only should deny leave to amend if amendment "would prejudice the opposing party, reward bad faith on the part of the moving party, or . . . amount to futility," *MTB Servs., Inc. v. Tuckman-Barbee Constr. Co.*, No. RDB-12-2109, 2013 WL 1819944, at *3 (D. Md. Apr. 30, 2013); *see Laber v. Harvey*, 438 F.3d 404, 426 (4th Cir. 2006). When considering a motion for leave to amend, "the court may take into account the stage of the proceedings," such as whether the parties have completed discovery. *Skinner*, 1995 WL 507264, at *2.

There is no question whether Plaintiff is acting in good faith: She seeks to withdraw two claims on the basis of what she learned in discovery and one claim because she has received what she sought in that claim (her Cameroonian ID card). Pl.'s Opp'n to Summ. J. 1 n.2. But, the prejudice to Defendants is not insignificant. Discovery is complete, and Defendants have filed the pending summary judgment motion, as well as a reply and a motion in limine that is pertinent to the evidence considered on summary judgment. Thus, Defendants "already incurred significant time and expense in discovery and in preparation for a summary judgment motion." *Skinner*, 1995 WL 507264, at *2. "The expenses of discovery and preparation of a motion for summary judgment may constitute prejudice sufficient to support denial of a voluntary dismissal." *Id.* Indeed, "'denial of voluntary dismissal is appropriate where summary judgment

is imminent.'" *Id.* (noting that "similar standards govern the exercise of discretion under [Rules 15(a) and 41(a)]") (citation omitted). Therefore, Plaintiff's motion to amend is DENIED. I will consider Defendants' summary judgment motion as to all counts of Plaintiff's Second Amended Complaint.

## IV.     SUMMARY JUDGMENT STANDARD

Summary judgment is proper when the moving party demonstrates, through "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials," that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a), (c)(1)(A); *see Baldwin v. City of Greensboro*, 714 F.3d 828, 833 (4th Cir. 2013). If the party seeking summary judgment demonstrates that there is no evidence to support the nonmoving party's case, the burden shifts to the nonmoving party to identify evidence that shows that a genuine dispute exists as to material facts. *See Celotex v. Catrett*, 477 U.S. 317, 322–23 (1986). The existence of only a "scintilla of evidence" is not enough to defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Instead, the evidentiary materials submitted must show facts from which the finder of fact reasonably could find for the party opposing summary judgment. *Id.* With regard to the counts that Plaintiff concedes, "those facts established by the motion" are "uncontroverted." *See Custer v. Pan Am. Life Ins. Co.*, 12 F.3d 410, 416 (4th Cir. 1993). Nonetheless, Defendants still must demonstrate that, based on those facts, they are entitled to judgment as a matter of law, because "[t]he failure to respond to the motion does not automatically accomplish this." *Id.*

## V.  DISCUSSION

### A.  Count I, Forced Labor in Violation of 18 U.S.C. §§ 1589 & 1595

#### 1.  *Applicable statute*

Plaintiff claims that Defendants violated the William Wilberforce Trafficking Victims Protection Reauthorization Act, 18 U.S.C. §§ 1581–1597 ("TVPRA"), an amendment to the Victims of Trafficking and Violence Protection Act, 18 U.S.C. § 1581 – 1594 (2000) ("TVPA"). The TVPA was enacted on October 28, 2000 "to combat trafficking in persons, a contemporary manifestation of slavery whose victims are predominantly women and children, to ensure just and effective punishment of traffickers, and to protect their victims."[11]  Pub. L. 106-386, Div. A, §§ 102(a) & 112(a)(2).  As enacted, 18 U.S.C. § 1589 made it a crime to

> knowingly provide[] or obtain[] the labor or services of a person--
>
> (1) by threats of serious harm to, or physical restraint against, that person or another person;
>
> (2) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint; or
>
> (3) by means of the abuse or threatened abuse of law or the legal process . . . .

18 U.S.C. § 1589 (2003).

The TVPRA amended the TVPA and introduced a statutory civil cause of action under 18 U.S.C. § 1595 in 2003.  Pub. L. 108-193, § 4(a)(4), 117 Stat. at 2877.  As enacted, 18 U.S.C. § 1595 provided that "[a]n individual who is a victim of a violation of section 1589, 1590, or 1591 of this chapter may bring a civil action against the perpetrator . . . and may recover

---

[11] Neither the parties in their briefs nor my independent research has identified any cases interpreting this relatively recent statute in this Court or the United States Court of Appeals for the Fourth Circuit.  Therefore, I will look to cases in other jurisdictions for guidance.

damages and reasonable attorneys fees." Congress amended the TVPRA, effective December 23, 2008.[12] Pub. L. 110-457, Title II, § 222(b)(3), 122 Stat. 5068.

Defendants cite the 2008 version of the TVPRA. However, Plaintiff lived with Defendants from April 2006 until May 2008, Pl.'s Opp'n to Summ. J. 3, 5, and the 2008 amendments did not go into effect until December 23, 2008. Plaintiff concedes that "the current version of § 1589 . . . . was added in late 2008, after Ms. Elat escaped from Defendants' home," but she argues that, "[b]ecause Defendants analyze and defend that version without objection, they have waived any argument they may have had against its retroactive application to their conduct." Pl.'s Opp'n to Summ. J. 17 n.9. As Plaintiff sees it, even if I apply the version of the TVPRA in effect at the time of the alleged events, "Ms. Elat's claims under former § 1589(1)-(3) (similar to current § 1589(a)(2)-(4)) are supported by the evidence and should survive summary judgment." *Id.*

---

[12] As amended, § 1589(a) makes it a crime to

> knowingly provide[] or obtain[] the labor or services of a person by any one of, or by any combination of, the following means--
>
> (1) by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person;
>
> (2) by means of serious harm or threats of serious harm to that person or another person;
>
> (3) by means of the abuse or threatened abuse of law or legal process; or
>
> (4) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint . . . .

18 U.S.C. § 1589(a) (2008). The amendment added § 1589(b), which makes it a crime to "knowingly benefit[] . . . from participation in a venture which has engaged in" a violation of § 1589(b). The amendment also expanded the civil action such that it may be brought against "the perpetrator (or whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of [Chapter 77, Peonage, Slavery, and Trafficking in Persons])." 18 U.S.C. § 1595 (2008).

Federal courts "employ a robust presumption against statutory retroactivity," under which they "assume that statutes operate prospectively only, to govern future conduct and claims, and do not operate retroactively, to reach conduct and claims arising before the statute's enactment." *Ward v. Dixie Nat. Life Ins. Co.*, 595 F.3d 164, 172 (4th Cir. 2010) (citing *Landgraf v. USI Film Prods.*, 511 U.S. 244, 265, 269–70 (1994)). This presumption "'is deeply rooted in our jurisprudence, and embodies a legal doctrine centuries older than our Republic.'" *Id.* (quoting *Landgraf*, 511 U.S. at 265).

> When determining whether the presumption against retroactivity bars the application of a statute in a given case, courts perform a three-step analysis. First, a court must "determine whether [the legislature] has expressly prescribed the statute's proper reach." If so, "there is no need to resort to judicial default rules," and hence, the presumption against retroactivity does not apply. If, however, the legislature has not prescribed the statute's reach, a court must move to step two and "determine whether the new statute would have a retroactive effect" if applied to the case at hand. If not, the presumption against retroactivity again has no application, but if it does, the presumption is triggered, and the court must then inquire under the third step whether the presumption is overcome with "clear congressional intent" in favor of retroactivity.

*Id.* (quoting *Landgraf*, 511 U.S. at 280).

Here, Congress has not "'expressly prescribed the statute's proper reach,'" and there is no "'clear congressional intent' in favor of retroactivity." *See Ward*, 595 F.3d at 172 (quoting *Landgraf*, 511 U.S. at 280); *Velez v. Sanchez*, 693 F.3d 308, 325 (2d Cir. 2012) ("Nothing in the language of the TVPRA or its legislative history indicates that Congress intended retroactive application."). Moreover, the presumption against retroactivity is triggered because, if applied to this case, the 2008 amendments would have a retroactive effect, as the alleged events concluded before the amendments went into effect. *See Ward*, 595 F.3d at 172. Therefore, I shall apply the statute in effect at the time of the events at issue, that is, prior to the 2008 amendment.[13] *See*

---

[13] As the following discussion shows, the outcome with respect to Plaintiff's claims would be the same regardless of which version of the statute applies.

*Adhikari v. Daoud & Partners*, No. 09-cv-1237, 2013 WL 4511354, at *9 (S.D. Tex. Aug. 23, 2013) (concluding that 2008 amendments to TVPRA did not apply retroactively, such that "for conduct from 2003 to 2008, only perpetrators were subject to liability" under § 1595); *see also Velez v. Sanchez*, 693 F.3d 308, 325 (2d Cir. 2012) (concluding that "civil cause of action does not apply retroactively"); *Ditullio v. Boehm*, 662 F.3d 1091, 1100–02 (9th Cir. 2011) (same); *Doe v. Siddig*, 810 F. Supp. 2d 127, 136 (D.D.C. 2011) (concluding that "permitting private litigants to bring suit under Section 1595 for violations of Sections 1589 and 1590 based on conduct predating December 19, 2003 would have an impermissible retroactive effect").

### 2. *Alleged threats of "serious harm" or "abuse of law or legal process"*

Plaintiff insists that Defendants obtained her services as a housekeeper by "threatening that [she] would be deported if she stopped working for them," which in Plaintiff's view "constitute[s] a classic case of threatened abuse of the law or legal process." Pl.'s Opp'n to Summ. J. 10; *see* 18 U.S.C. § 1589(3). Further, she argues that "deportation from this country constitutes serious harm in itself." Pl.'s Opp'n to Summ. J. 13. Defendants contend that Plaintiff's argument fails because she "was not subject to force or physical restraint" and "did not suffer and was not threatened with serious harm." Defs.' Mem. 77. Specifically, Defendants argue that "even the conversation [Plaintiff] testified to between Caroline and herself regarding plaintiff possibly being subject to deportation would be insufficient to meet the 'serious harm standard.'" *Id.* at 78. Defendants insist that, according to Plaintiff's own testimony, which is not contradicted, only one of the three Defendants told Plaintiff that she could be deported, and Defendant Caroline Ngoubene only mentioned deportation to Plaintiff once over the course of more than two years. Defs.' Summ. J. Repy 2, 11–13. Defendants also argue that, even if deportation could be a threat to other aliens, deportation was not a threat to Plaintiff because she

wanted to return to Cameroon. *Id.* at 10, 13. Defendants identify repeated instances in which Plaintiff testified that she wanted to go home. *E.g.*, Elat Dep. 99:15 – 100:15, 101:6–17, 107:4–11, 110:22 – 111:1; Elat Dep. II 493:15–16, 495:21 – 496:4. At the same time, Defendants insist that Plaintiff's testimony shows that she was living at the Ngoubene house voluntarily and could return to Cameroon if she chose. Defs.' Summ. J. Reply 4, 7–8.

The threat of deportation "can constitute serious harm to an immigrant within the meaning of the forced labor statute." *United States v. Rivera*, No. 09-CR-619 (SJF), 2012 WL 2339318, at *5 (E.D.N.Y. June 19, 2012). It also "'clearly falls within the concept and definition of "abuse of legal process"'" when "'the alleged objective for such conduct was to intimidate and coerce [Plaintiff] into forced labor.'" *Antonatos v. Waraich*, No. 1:12-cv-1905-JMC, 2013 WL 4523792, at *5 (D.S.C. Aug. 27, 2013) (quoting *Nunag–Tanedo v. E. Baton Rouge Parish Sch. Bd.*, 790 F. Supp. 2d 1134, 1146 (C.D. Cal. 2011) (internal citations omitted)). Indeed, "[t]he threat of deportation alone may support a claim for forced labor." *Aguirre v. Best Care Agency, Inc.*, ---- F. Supp. 2d ----, 2013 WL 4446925, at *12 (E.D.N.Y. Aug. 16, 2013); *see Calimlim*, 538 F.3d at 713; *United States v. Alstatt*, 858 F. Supp. 2d 1032, 1041 (D. Neb. 2012) ("A threat of deportation which causes involuntary servitude may be sufficient."). The United States Supreme Court has noted that "threatening . . . an immigrant with deportation could constitute the threat of legal coercion that induces involuntary servitude, even though such threat made to an adult citizen of normal intelligence would be too implausible to produce involuntary servitude." *United States v. Kozminski*, 487 U.S. 931, 948 (1988).

*Camayo v. John Peroulis & Sons Sheep, Inc.*, Nos. 10–cv–00772–MSK–MJW, 11–cv–01132–MSK–MJW, 2012 WL 4359086, at *2 (D. Colo. Sept. 24, 2012), is instructive. There, one of the defendants explicitly threatened one of the plaintiffs with deportation twice, another

time informed that plaintiff that "'he had called immigration and the police' about some of [the plaintiff's] coworkers who had left the ranch," and yelled a deportation threat at another plaintiff at least once. The court noted that "there are other cases in which courts have found that [an] employer's comments about immigration consequences that could occur, do not by themselves constitute an abuse of the legal process; rather, an employee is obligated to show that the threatened use of the legal process is a misuse of that process." *Id.* at *4 (citing *Alvarado v. Universidad Carlos Albizu*, No. 10-22072-CIV, 2010 WL 3385345 (S.D. Fla. Aug. 25, 2010) (collecting cases)). Distinguishing *Alvarado*, the court denied the defendants' motion to dismiss because, "[t]aken as a whole, this conduct could be found to constitute an abuse of the legal process." *Id.* at *5. Significantly, the court noted:

> This is not to say that an employer automatically violates the TVPA by acknowledging the adverse immigration consequences that might befall an employee who is terminated. Certainly, the TVPA was not intended to completely muzzle employers or prohibit them from mentioning certain legal realities. Rather, this Court is persuaded that the question of whether statements (and actions) by an employer [constitute an abuse of the legal process] must be viewed in light of all the surrounding circumstances, and thus, resolution of whether a certain statement amounts to an abuse of the legal process is one that is particularly difficult on the sparse record of a motion to dismiss.

*Id.* at *5 n.6.

*Garcia v. Curtright*, No. 6:11-06407-HO, 2012 WL 1831865 (D. Or. May 17, 2012) also provides guidance. There, the plaintiff, whose "immigration status [was] not apparent from the face of plaintiff's amended complaint," worked for the defendants, cleaning their properties. *Id.* at *1, *4. The plaintiff alleged that Mr. Curtright, owner of the defendant companies, "forced" her to take his mother into her home and provide continual care for her by threatening to have his "government friends" deport her if she did not comply. *Id.* at *1, *3. The defendants moved to dismiss and the court denied the motion, reasoning that "the alleged threatened deportation of plaintiff and her family would on the face of the complaint, constitute sufficiently serious

threatened harm to preclude dismissal of her second claim at this stage of litigation." *Id.* at *4. The court observed:

> [N]ot all bad employer-employee relationships constitute forced labor. First, the threat of harm must be considered from the vantage point of a reasonable person in the place of the victim, and must be "sufficiently serious" to compel that person to remain with the employer. 18 U.S.C § 1589(c)(2). Second, the scope of the statute is further narrowed by the requirement of scienter. *Dann*[,] 652 F.3d at 1170 (citing *U.S. v. Calimlim*, 538 F.3d 706, 711–12 (7th Cir. 2008)). The employer must intend to cause the victim to believe that she would suffer serious harm if she did not continue to work. In other words, under section 1589, the employer must not just threaten serious harm but have intended the victim to believe that such harm would befall her. *Id.*

*Id.* at *4; *see also Catalan v. Vermillion Ranch Ltd. P'ship*, No. 06–cv–01043–WYD–MJW, 2007 WL 38135, at *8 (D. Colo. Jan. 4, 2007) (finding that "the First Amended Complaint state[d] a claim for relief pursuant to 18 U.S.C. §§ 1589 and 1590" and denying the defendants' motion to dismiss because the complaint "allege[d] that the four Plaintiffs stating a claim under TVPRA were threatened with deportation if they did not remain on the Ranch").

I have not found a case specifically on point, or anything at all from the Fourth Circuit or this district. Unlike in the case before me, in the majority of the cases in which the plaintiffs alleged threats of deportation in a TVPRA claim and the court denied the defendants' motion to dismiss or for summary judgment, the courts noted that the defendants made multiple threats of deportation, often accompanied by threats of other harm, and/or threatened to take action to have the plaintiffs deported. *See Aguirre*, 2013 WL 4446925, at *2, *4, *5, *12–13; *Ruiz v. Fernandez*, ---- F. Supp. 2d ----, 2013 WL 2467722, at *20 (E.D. Wash. June 7, 2013); *Tanedo v. E. Baton Rouge Parish Sch. Bd.*, No. SA CV10–01172 JAK (MLGx), 2012 WL 5378742, at *2–4 (C.D. Cal. Aug. 27, 2012); *Panwar v. Access Therapies, Inc.*, No. 1:12–cv–00619–TWP–TAB, 2013 WL 5486783, at *7 (S.D. Ind. Sept. 30, 2013); *Antonatos v. Waraich*, No. 1:12-cv-1905-JMC, 2013 WL 4523792, at *2, *4–5 (D.S.C. Aug. 27, 2013); *Zavala v. Curtright*, No. 6-12-cv-

1488-AA, 2012 WL 5471154, *1, *3 (D. Or. Nov. 9, 2012); *Kiwanuka v. Bakilana*, 844 F. Supp. 2d 107, 115 (D.D.C. 2012); *Camayo*, 2012 WL 4359086, at *2; *Ramos-Madrigal v. Mendiola Forestry Serv.*, LLC, 799 F. Supp. 2d 958, 960 (W.D. Ark. 2011); *Shuvalova v. Cunningham*, No. C 10-2159 RS, 2010 WL 5387770, at *4, *7 (N.D. Cal. Dec. 22, 2010); *see also Carazani v. Zegarra*, ---- F. Supp. 2d ----, 2013 WL 5303492, at *19 (D.D.C. July 3, 2013) (granting the plaintiff's default judgment motion) *Magnifico v. Villanueva*, No. 10-cv-80771, 2012 WL 5395026, at *1 (S.D. Fla. Nov. 2, 2012) (same); *Doe v. Howard*, No. 1:11-cv-1105, 2012 WL 3834867, at *4 n.3 (E.D. Va. Sept. 4, 2012) (same); *Gurung v. Malhotra*, 851 F. Supp. 2d 583, 588, 594 (S.D.N.Y. 2012) (same); *Canal v. Dann*, No. 09-3366 CW, 2010 WL 3491136, at *2 (N.D. Cal. Sept. 2, 2010) (same). In an appeal of a criminal proceeding related to *Canal v. Dann*, the Ninth Circuit affirmed the forced labor conviction, in part because "[a] juror could reasonably have concluded that Dann intended to keep Peña Canal in fear of serious immigration consequences" based on the fact that Dann "repeatedly threaten[ed] to send Peña Canal back to Peru," even though "Dann never explicitly threatened deportation." *United States v. Dann*, 652 F.3d 1160, 1172 (9th Cir. 2011).

Yet, none of these cases explicitly stated a minimum for conduct that is actionable under the TVPRA. Indeed, as discussed, the threat of deportation alone can be actionable, *Aguirre v. Best Care Agency, Inc.*, ---- F. Supp. 2d ----, 2013 WL 4446925, at *12 (E.D.N.Y. Aug. 16, 2013), and the threat need not be that the defendant himself or herself will take action to have the plaintiff deported, *see United States v. Askarkhodjaev*, No. 09-00143-01-CV-W-ODS, 2010 WL 4038783, at *3 (W.D. Mo. Sept. 23, 2010) ("The statute does not specify that the 'serious harm' be at the defendant's hand. It . . . . prohibits intentionally creating the belief that serious harm is possible, either at the defendant's hands or those of others."). Moreover, none of these cases is

binding on this Court, and there is no controlling authority in the Fourth Circuit or informative case from this district.

Significantly, the threats of deportation—which, in this case, admittedly are limited to a single reference to deportation by Caroline Ngoubene[14]—cannot be examined in a vacuum. Rather, I must consider Caroline Ngoubene's statement "in light of all the surrounding circumstances." *See Camayo*, 2012 WL 4359086, at *5 n.6. I am mindful that the statute, albeit as amended in 2008, defines "serious harm," which can encompass a threat of deportation, *see United States v. Rivera*, No. 09-CR-619 (SJF), 2012 WL 2339318, at *5 (E.D.N.Y. June 19, 2012), as "any harm . . . that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm." 18 U.S.C. § 1589(c)(2) (2008).

The pertinent conversation occurred in October 2006 when, after Plaintiff "told Marie-Therese that [she] wanted to leave, . . . Caroline said, well, [you] can't leave the house because [you] don't have papers," and "Caroline used the term 'deported.'" *Id.* at 108:6–17, 109:1; *see id.* at 110:20 – 111:6 (same). Plaintiff testified as follows:

---

[14] Plaintiff testified that the October 2006 conversation was the only time Caroline Ngoubene mentioned deportation, and that Roxane Ngoubene and Dany Ngoubene never mentioned deportation. Elat Dep. 109:14–19. Additionally, when Plaintiff was asked whether her uncle and aunt, François and Marie-Thérèse Ngoubene, who she alleged in her original Complaint were the masterminds behind her being brought to the United States under false pretenses and forced into involuntary domestic labor, and in whose household she worked, ever threatened her with deportation, she answered "No." *Id.* at 107:22 – 108:5. Specifically,

> Q    Did the Ngoubenes ever—when I'm referring to the Ngoubenes, I'm referring to François and Marie-Thérèse, did Mr. and Mrs. Ngoubene ever threaten to send you back to Cameroon, that you're aware of?
> **A    No.**

*Id.*

| Q | Did Caroline or her mother that day ever say to you that they were going to contact Immigration to have you sent back, that they were going to try to deport you? Did they tell you that? |
| --- | --- |
| **A** | **No.** |
| Q | And were you angry when Caroline said this to you? |
| **A** | **No.** |
| Q | Did you understand she was just trying to helpfully tell you about what the law was? |
| **A** | **Yes.** |

*Id.* at 113:9–19.

It is significant that, as soon as Plaintiff mentioned to Marie-Thérèse Ngoubene that she wanted to return to Cameroon, her aunt left the room and Caroline Ngoubene "came downstairs right away," leading Plaintiff to "assume" that Caroline Ngoubene's mother, Marie-Thérèse Ngoubene, sent her to talk to Plaintiff. *Id.* at 100:5–19. Caroline Ngoubene is an attorney who "specialize[s] in immigration." Caroline Ngoubene Dep. 8:12–14, Pl.'s Opp'n to Summ. J. Ex. E. Further, Plaintiff did not simply say that she wanted to leave the Ngoubene household; she specifically said to her aunt and cousin that she "wanted to go back home" to Cameroon. *Id.* at 110:20 – 111:1. If she returned to Cameroon, she would no longer be in the United States and therefore could not be subject to deportation. A genuine dispute exists with regard to the import of these material facts, and a reasonable jury could find that, under these circumstances, it is both a threat of serious harm and an abuse of the law for Caroline Ngoubene, as an attorney who specializes in immigration, to represent that Plaintiff would be deported for trying to return to Cameroon. *See* 18 U.S.C. § 1589(3); Fed. R. Civ. P. 56(a), (c)(1)(A); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986).

It is true that the evidence shows that Plaintiff wanted to return to Cameroon and once, in October 2006, told Marie-Thérèse Ngoubene that she "wanted to leave." Elat Dep. 99:15 – 100:15; 101:6–17; 107:4–11, 110:22 – 111:1; Elat Dep. II 493:15–16, 495:21 – 496:4. But the

fact that Plaintiff wanted to return to her homeland is not tantamount to Plaintiff not finding the prospect of returning via deportation proceedings to be threatening. Additionally, Plaintiff testified in a second deposition that, although Caroline Ngoubene's tone was not threatening, she later perceived Caroline Ngoubene's reference to possible deportation to be a threat. Elat Dep. II 469:6–10, 505:21 – 506:1. She said that deportation "was considered as a threat for [her]" because she "thought it would be like in France," where she thought "it's very violent." *Id.* at 470:11 – 471:6. Plaintiff explained that she did not "know what [Caroline Ngoubene] was referring to" when she mentioned deportation, and did not "[take] it as a threat" until "after searching" on the Internet that night and seeing a video of a violent deportation in France. *Id.* at 492:15 – 493:5, 502:10 – 506:1. Plaintiff said that she "wanted to go back" to Cameroon, but she also said that she "was afraid of going back to Cameroon because [she] didn't know what the Ngoubenes . . . were going to do," and she was "afraid of what will happen to [her]." *Id.* at 493:15–16, 494:21 – 496:4. Plaintiff said she was afraid of "the complete reject of [her] family and because the Ngoubenes are very powerful back home, that was [her] concern too, that they will send anybody after [her] . . . . and [her] family." *Id.* at 508:12 – 509:3. A jury reasonably could find that "a reasonable person of [Plaintiff's] background and in [her] circumstances" would believe Caroline Ngoubene's statement and feel "compel[led] to perform or to continue performing labor or services in order to avoid [deportation]." *See* 18 U.S.C. § 1589(c)(2) (2008).

Defendants rely on Plaintiff's testimony from her first deposition, which Defendants noted, that she was not "angry" at Caroline for mentioning deportation, that Plaintiff agreed that Caroline was being "helpful[]," *see* Elat Dep. 113:9–19, and that Plaintiff agreed that "deportation back to Cameroon wasn't really much of a threat to [her] because [she] wanted to go back to Cameroon anyway," *see id.* at 326:7–10. Defs.' Mem. 34 n.11, 78. Defendants

suggest that Plaintiff's later testimony at her second deposition cannot create a genuine dispute of material fact because Plaintiff's counsel noted that deposition to obtain testimony from Plaintiff to contradict the testimony she previously gave when deposed by Defendants. Defs.' Mem. 34 n.11, 78.  Under the sham affidavit doctrine, which is analogous to this situation,

> "a party cannot create a genuine issue of fact sufficient to survive summary judgment simply by contradicting his or her own previous sworn statement (by, say, filing a later affidavit that flatly contradicts that party's earlier sworn deposition) without explaining the contradiction or attempting to resolve the disparity." *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 806 (1999). Application of the sham affidavit rule at the summary judgment stage "must be carefully limited to situations involving flat contradictions of material fact." *Mandengue v. ADT Sec. Sys., Inc.*, No. ELH–09–3103, 2012 WL 892621, at *18 (D. Md. Mar. 14, 2012).

*Zimmerman v. Novartis Pharmaceuticals Corp.*, 287 F.R.D. 357, 362 (D. Md. 2012).

But, under the circumstances, Plaintiff's later testimony did not create a "'flat contradiction[] of material fact.'"  *See id.* (citation omitted).  Plaintiff initially did not testify that she did not view deportation as a threat; she simply testified that she was not upset with her cousin for mentioning deportation.  *See* Elat Dep. 113:9–19.  As for her later testimony that "deportation back to Cameroon wasn't really much of a threat," *see id.* at 326:7–10, it must be considered in context.  Plaintiff testified that, in October 2010, long after she left the Ngoubene household, her mother told her that "the embassy police" were "looking after [*sic*]" her "[t]o deport" her.  *Id.* at 320:13 – 324:1.  She then testified as follows:

Q    What did you tell your mother when she raised this whole embassy police business? Did you tell her not to worry?
**A    I didn't say don't worry. I told her that I believe I have protection.**
Q    And you were referring to the T-1 status then?
**A    Yes.**
Q    So at that point, you had the T-1 status and were not worried about deportation; is that correct?
**A    I didn't really -- I knew it was for protection. But I didn't really know the details, you know.**
Q    And you told your mother not to worry about deportation?

| | |
|---|---|
| A | **Yes. I was always told not to worry at Break the Chain. And...** |
| Q | And you did not want to go back to Cameroon, did you? |
| A | **If the occasion came, I will -- I would have go back. I will have gone back to Cameroon, yes.** |
| Q | Permanently, or just to visit? |
| A | **Permanently.** |
| Q | So you wouldn't mind going back to Cameroon permanently? |
| A | **Mm-mm.** |
| Q | Why is that? |
| A | **Just because it's my country, and I miss my brothers and sister. I wouldn't mind going back.** |
| Q | Well, why is it, if you miss your country and you wouldn't mind going back, you don't go back? |
| A | **I didn't have money to go back.** |
| Q | So it's just a question of airfare; is that right? |
| A | **In some way, yes.** |
| Q | So deportation back to Cameroon wasn't really much of a threat to you because you wanted to go back to Cameroon anyway and still do, correct? |
| A | **Yes.** |

It is reasonable to infer that Plaintiff testified that she did not perceive deportation as a threat in *October 2010*, which is not the same thing as how she perceived deportation four years earlier, when Caroline Ngoubene mentioned it to her. Also, Plaintiff's deposition testimony and reliance on an interpreter make clear that English is her second language and that she may not fully grasp the nuances of the language. Given Plaintiff's trust in authority figures to make significant decisions for her and adherence to their decisions, it would be reasonable for a jury to infer that Caroline Ngoubene could mention deportation in a non-threatening manner, knowing that one passing reference to a legal concept that her cousin would not fully understand would be enough to dissuade Plaintiff from attempting to leave the Ngoubene home. Thus, Plaintiff's subsequent deposition testimony is not a "'flat contradiction[] of material fact'" for purposes of application of the sham affidavit doctrine, *Zimmerman*, 287 F.R.D. at 362 (quoting *Mandengue*, 2012 WL 892621, at *18), and it creates a dispute of material fact regarding whether Caroline Ngoubene's statement constituted a sufficient threat of serious harm for purposes of the TVPRA.

Defendants argue that Plaintiff's labor could not have been forced by any means because "[t]here is no factual dispute that plaintiff voluntarily stayed at the Ngoubene home," and "'[v]oluntariness is of course a defense' to charges under the TVPA." Defs.' Mem. 76 (quoting *United States v. Djoumessi*, 538 F.3d 547, 552 (6th Cir. 2008)). In support of their position, Defendants contend:

> Plaintiff voluntarily returned to the Ngoubene home after her trip to Cameroon. She travelled back from Cameroon to the U.S. on her own. She chose to bring her daughter to live with her at the Ngoubenes. She routinely contacted people outside the Ngoubene home through phone and e-mail. She often went to places on her own or just with her daughter. She was never abused or threatened with physical violence at anytime. She was able to use public transportation. She formed relationships with people other than the Ngoubene family members.

*Id.* Additionally, they assert that Plaintiff fails to "allege that the Ngoubene family, and especially the defendants, prevented her from returning" to Cameroon. *Id.*

Although Plaintiff does not allege any "threats of serious harm to [her]" other than deportation, and she does not allege any "physical restraint against [her]," 18 U.S.C. § 1589(1); *see* Elat Dep. 279:14 – 281:21, Plaintiff argues that "the totality of her treatment by Defendants and their parents" show that her labor was forced, not voluntary. Pl.'s Opp'n to Summ. J. 7. According to Plaintiff, she "had every reason to be fearful of what would happen if she attempted to leave the Ngoubene home" because she "was a recent arrival to the United States from Cameroon" who "spoke little of the language, and knew only her family members, one of whom held an influential position at her country's embassy." *Id.* at 8 (citations to depositions omitted). Plaintiff adds that she "lacked a high school education," and "depended on her relatives for her shelter, food, clothes, and legal status." *Id.* (citations to depositions omitted). And, as noted, the record before me is devoid of any evidence that Plaintiff was paid the wages referenced in the agreement she signed in Cameroon, before coming to the United States. The

lack of financial resources, combined with the foregoing isolating circumstances could be viewed by a jury as demonstrating that Plaintiff remained with Defendants involuntarily.

Although the record is replete with evidence that Plaintiff left the Ngoubene home on various occasions and returned, *e.g.*, Elat Dep. 199:4 – 200:17; 242:15–19; 407:22 – 411:13,[15] this evidence must be considered under the totality of the circumstances. *See Camayo*, 2012 WL 4359086, at *5 n.6; 15 U.S.C. § 1589(c)(2). As discussed, Plaintiff followed the directions of adult authority figures, including her mother, aunt and uncle, and perhaps her cousin Caroline Ngoubene,[16] without question. Therefore, even though she left the Ngoubene home for errands and returned, and even travelled to Cameroon with the Ngoubenes in the summer of 2007 and then returned to their home in the United States, departing Cameroon after the Ngoubenes already had left and bringing her daughter to live with her at the Ngoubene home, *see* Elat Dep. 104:21 – 105:7; 115:13 – 116:8; 117:10–21; Elat Dep. II 479:15–16, there is a sufficient dispute of material fact to permit a jury to determine whether Plaintiff understood that she had any other option. Tellingly, Plaintiff testified as follows:

---

[15] Specifically, Plaintiff attended GED classes and first communion classes, Elat Dep. 242:15–19, and she rode the bus to the mall with her daughter and without any of the Ngoubenes, *id.* at 407:22 – 411:13. Although Marie-Thérèse Ngoubene told Plaintiff not to leave the house unaccompanied, Plaintiff "sometimes [would] just sneak out [of] the house." *Id.* at 199:4 – 200:17. Also, Plaintiff routinely contacted people outside the Ngoubene home, in Cameroon and the United States, through own cell phone and e-mail, and Defendants did not limit her Internet access. *Id.* at 80:5–21, 262:13 – 263:4, 385:10–20. *Cf. Doe v. Howard*, No. 1:11-cv-1105, 2012 WL 3834867, at *4 (E.D. Va. Sept. 4, 2012) (defendants "monitor[ed] [plaintiff's] telephone calls" and "generally forbid[] her from leaving the house without being accompanied by one of them").

[16] Caroline Ngoubene is only four years older than Plaintiff. *See* Caroline Ngoubene Dep. 135:2–10. However, Caroline Ngoubene arrived in the United States in 1999, seven years before Plaintiff. *See id.* at 36:2–22, 38:9–11; Pl.'s Opp'n to Summ. J. 3; Defs.' Mem. 14. Moreover, when Plaintiff came to live with the Ngoubenes, Caroline was twenty-five and had completed her law degree, while Plaintiff had not completed high school or passed the GED. Caroline Ngoubene Dep. 56:16–20; Pl.'s Opp'n to Summ. J. 8.

Q      Well, in fact, when you went back to Cameroon in 2007, you updated the visa to correctly reflect that you were having a work visa to work and live at the Ngoubenes'; isn't that right?

**A      That's right.**

Q      And you voluntarily went back to Cameroon in the summer of 2007 to update your visa for that purpose; isn't that correct?

**A      Voluntarily?**

Q      Willingly. Freely. Isn't that correct?

**A      My—*Mr. Ngoubene told me I had to change the visa* because it was a wrong one.**

Q      And you knew that it was a wrong one; isn't that correct?

**A      No. *I didn't know what type of visa it was.***

Q      All right. And when you went back that summer of 2007, you agreed to get a new visa that would show you with a work visa to be in the United States working for the Ngoubenes; isn't that true?

**A      Yes.**

Q      And nobody forced you to do that, did they?

**A      *I had to.***

Q      Well, when you say you had to, you could have stayed in Cameroon if you wanted to; isn't that correct?

**A      It is.**

Q      And you decided freely and voluntarily to come back from Cameroon with your daughter in 2007 to live in the United States again; isn't that true?

**A      It is.**

Q      And you did so of your own free will; isn't that true?

**A      *I was told to.***

Q      No, but you agreed to do it. You were willing to do that; isn't that correct?

**A      It is.**

Q      And when you came back to the United States, you were happy to be coming back with your daughter; isn't that right?

**A      It is.**

Elat Dep. 114:12 – 116:8 (emphasis added). Plaintiff also testified:

Q      [Y]ou were agreeable to come back to the United States after the summer of 2007 because you would have your daughter with you; isn't that right?

**A      It is.**

Q      And you never, ever, after you came back in 2007, ever once asked to go back to Cameroon again, did you?

**A      I never.**

*Id.* at 104:21 – 105:7; *see also id.* at 152:14–15 (With regard to signing her employment contract,

Plaintiff testified: "[W]e made those copies, and *I had to* sign those documents." (emphasis

added)).  As noted, Plaintiff may not have understood all of the questions posed to her.  Further, a genuine dispute exists with regard to these material facts because Plaintiff's short answers allow for multiple inferences: She could have been happy to have her daughter with her, without being happy that she had to return to the United States or that she had to bring her daughter to the United States.  Thus, in the light most favorable to Plaintiff, there is sufficient evidence that she did not remain with the Ngoubenes voluntarily to permit this case to be presented to the jury.

Moreover, the totality of the circumstances provides a reasonable inference that the remaining Defendants participated in a scheme with their parents to cause Plaintiff to believe that she had to work for them or she would be deported.[17]  A scheme involving multiple people, or conspiracy, exists if the following elements are present: "(i) a confederation of two or more persons by agreement or understanding; (ii) some unlawful or tortious act done in furtherance of the conspiracy or use of unlawful or tortious means to accomplish an act not in itself illegal; and (iii) actual legal damage resulting to the plaintiff."  *Paccar Inc. v. Elliot Wilson Capitol Trucks LLC*, 905 F. Supp. 2d 675, 696 (D. Md. 2012); *see United States v. Nnaji*, 447 F. App'x 558, 560 (5th Cir. 2011) (affirming district court's finding of guilty on charges of forced labor and conspiracy to commit forced labor; reasoning that "[t]he evidence showed that [defendant wife] individually and in concert with her husband took advantage of the victim's vulnerabilities and coerced her into performing work for the family" where "[t]he victim testified that [defendant wife] was present when [defendant husband] took the victim's travel documents, which the jury

---

[17] Plaintiff also argues that "Defendants knowingly benefitted from the venture to obtain Ms. Elat's forced labor."  Pl.'s Opp'n to Summ. J. 17.  Knowingly benefitting from the forced labor of a victim of human trafficking is a violation of 18 U.S.C. § 1589(b) (2008), but (b) was not a part of the operative statute that was in effect at the time of Plaintiff's alleged servitude.  *See* 18 U.S.C. § 1589 (2003).  Therefore, Plaintiff's contention that Defendants knowingly benefitted from Plaintiff's labor cannot establish a violation of the operative version of the TVPRA that governs her claims.

could have inferred was an effort to keep the victim at the Nnajis' home"; the defendant wife "also told the victim that her salary would be deposited in a bank account and that money was being sent to the victim's children in Nigeria, lies which the jury could have inferred were told to coerce the victim into continuing to work for the Nnajis"; and "the Nnajis kept her isolated, prohibiting her from making contact with outsiders, deciding not to teach her how to use the telephone other than for emergency situations, and accompanying her whenever she left the house").

"A scheme, plan or pattern violates § 1589 where it is intended to cause a person to believe that, if she did not perform such labor or services, she or another individual would suffer serious harm." *Aguirre v. Best Care Agency, Inc.*, ---- F. Supp. 2d ----, 2013 WL 4446925, at *11 (E.D.N.Y. Aug. 16, 2013) (noting that in *United States v. Calimlim*, 538 F.3d 706, 713 (7th Cir. 2008), the Seventh Circuit stated: "The evidence showed that [the defendants] intentionally manipulated the situation so that [the individual] would feel compelled to remain.... Their vague warnings that someone might report [her] and their false statements that they were the only ones who lawfully could employ her could reasonably be viewed as a scheme to make her believe that she or her family would be harmed if she tried to leave").  Relevantly, a scheme or conspiracy "can be inferred from circumstantial evidence."  *United States v. Sabhnani*, 599 F.3d 215, 244 (2d Cir. 2010) (noting that "'a single act may be sufficient for an inference of involvement . . . if the act is of a nature justifying an inference of knowledge of the broader conspiracy'" and concluding that "evidence . . . that Mahender [Sabhnani] assisted his wife in bringing the maids to his home, that he did so to benefit from their labor, which he helped to direct, and that, knowing of his wife's threats and punishments, he aided her in meting them out . . . . provide[d] more than a sufficient basis on which to conclude that there was a 'tacit understanding' between

Mahender and Varsha [Sabhnani] that the maids would be held in involuntary servitude and

peonage in the Sabhnanis' home").

> According to Plaintiff,
>
> Defendants and their family pressured Ms. Elat to stay as a laborer in their home
> through subtle and implied (but nonetheless real) threats of deportation, and
> through psychological manipulation based on Ms. Elat's immigration status,
> educational goals, family history, and the specter of the Ngoubene family's
> political influence in both Cameroon and the U.S.

Pl.'s Opp'n to Summ. J. 14.  Plaintiff insists that Defendants can "be liable for obtaining labor by

means of an unlawful scheme, plan, or pattern" without "be[ing] the driving force behind the

manipulation or threats."  *Id.*  In her view, "[t]he evidence in this case . . . shows nothing less

than a comprehensive scheme—that took place over at least two years—by the Ngoubene family

to compel Ms. Elat to work for them."  *Id.* at 15.

As evidence, Plaintiff testified that the family held meetings with regard to this scheme,

*id.* at 15–16, and she testified that she "assume[d]" that Defendants "mentioned things to their

parents . . . because they have meetings."  Elat Dep. 361:3 – 362:8.  Although she admits that

she, "of course, cannot produce the minutes from the Ngoubene family meetings to show

Defendants' specific assent to their parents' scheme," Pl.'s Opp'n to Summ. J. 15–16, Plaintiff

identifies evidence that a jury could find supports her allegation.  She asserts that Defendants

were present while Plaintiff worked in their home "perform[ing] tasks like cooking breakfast for

Defendants" and "braid[ing] Defendants' hair for hours at a time"; Roxane Ngoubene showed

Plaintiff how the Ngoubene family liked their coffee and rice prepared; Caroline Ngoubene knew

that Plaintiff "wanted to return to Cameroon to be with her daughter" and "warned Ms. Elat of

her precarious immigration status" after Plaintiff mentioned to Marie-Thérèse Ngoubene that she

wanted to leave; and Dany Ngoubene "verbally demeaned Ms. Elat and her daughter."  *Id.* at 16.

Plaintiff also alleges that Defendants enforced "their parents' strict rules for Ms. Elat," and that Roxane Ngoubene attempted to take Plaintiff's passport.[18] *Id.*

The evidence Plaintiff provides may not create an impenetrable case, but considering it in the light most favorable to Plaintiff, as I must, *see Ricci v. DeStefano*, 557 U.S. 557, 586 (2009), it does raise a reasonable inference from which a jury reasonably could find that the remaining Defendants, in collusion with their parents, acted to prevent Plaintiff from leaving their home after François Ngoubene brought her to the United States to work in their home. As noted, Mr. Ngoubene had Plaintiff, his niece who perceived him as a trustworthy authority figure, sign a contract she did not understand without explaining it or providing her with time to review it. Clearly, Mr. Ngoubene intended for Plaintiff to work as a domestic servant in his house, as the contract provided that she would "perform as a domestic worker" and that he would be her "Employer." Contract 1 & art. 2. Consequently, Plaintiff came to the United States, not knowing that she had signed a contract to work as Mr. Ngoubene's domestic servant, and found herself working without pay in the Ngoubene household, not knowing that she had a choice in the matter.[19] Moreover, when Plaintiff mentioned to her aunt, Marie-Thérèse Ngoubene, that she wanted to return to Cameroon, her aunt sent Plaintiff's cousin, attorney Caroline Ngoubene, to

---

[18] While withholding a passport or documentation is an improper means of securing labor, *see* 18 U.S.C. § 1592(a), Defendants did not withhold Plaintiff's passport. Elat Dep. 274:15 – 276:1, 277:3–7. Although Defendants allegedly looked for Plaintiff's passport when Plaintiff was leaving, Plaintiff already had given her passport to her husband for safekeeping. *Id.* Therefore, Defendants did not withhold Plaintiff's documents to compel her to work for them. *See id.* This effort to find her passport, however, may be probative of their intent to deprive Plaintiff of her passport, which, in combination with the other actions taken, could demonstrate a scheme or plan to obtain Plaintiff's labors.

[19] Even if Plaintiff originally travelled to the United States willingly, Defendants still could be liable if their later actions prevented her from leaving when she no longer wanted to remain. *See United States v. Marcus*, 628 F.3d 36, 45 (2d Cir. 2010) (concluding that "the plain meaning of the forced labor statute unambiguously applie[d] to [the defendant's] conduct" even though the victim's "enslavement arose from her initial participation in consensual BDSM activities").

speak with her, and Caroline Ngoubene told Plaintiff that she could be deported if she left the Ngoubene home. As discussed, Caroline Ngoubene's reference to deportation constitutes a threat of serious harm for purposes of the TVPRA.

Roxane Ngoubene showed Plaintiff how to perform domestic tasks like making coffee and rice. Elat Dep. 212:7–11. Also, at François Ngoubene's direction, Roxane Ngoubene searched for Plaintiff's passport when Plaintiff announced that she was leaving. *Id.* at 274:15–22. Although her search was fruitless and therefore did not lead to a violation of 18 U.S.C. § 1592(a), it raises the inference that Roxane Ngoubene was part of a scheme to keep Plaintiff in the Ngoubene household as a domestic servant.

Further, Marie-Thérèse Ngoubene had two "strict rules" for Plaintiff (don't go out alone, don't talk to strangers) that limited her freedom. Indeed, Dany, Roxane, and Caroline Ngoubene each told Plaintiff that she could not talk to strangers, Elat Dep. 273:6–18; 381:8–19, and Dany and Caroline Ngoubene enforced the rule when they were outside the home with Plaintiff, *id.* at 380:5 – 382:19. The fact that the remaining Defendants, also, were not supposed to talk to strangers strengthens the restrictive and isolating nature of this rule. Additionally, the remaining Defendants would "tell on" Plaintiff if she went out alone. *Id.* at 271:14–18. A jury reasonably could infer from these actions that the remaining Defendants were part of a scheme to prevent Plaintiff from leaving their household. Moreover, restrictions on Plaintiff's actions outside of work hours violate her employment contract, which explicitly stated that "[b]oth parties understand that the Employee cannot be required to remain on the premises after working hours without compensation." Contract art. 8.

Plaintiff also testified that she "saw [Defendants] having meetings at their mom's bedroom all the time, whenever they had to take a decision, they had to gather for that decision."

Elat Dep. 361:15 – 362:3; *see also id.* at 200:10–12 ("I don't know how their house really function [*sic*]. They will have meeting [*sic*] in their mom's house – mom's room, bedroom, and that's how it was . . . ."). Indeed, Caroline Ngoubene conceded that, "[o]n occasion, [her] parents have called the children together" to discuss "family-related" issues, such as "some of [their] parents' possessions or trips to Cameroon." Caroline Ngoubene Dep. 91:4–12. Thus, a jury reasonably could find that the remaining Defendants participated in a scheme with their parents to keep Plaintiff in their home as a domestic servant. *See United States v. Sabhnani*, 599 F.3d at 244; *Nnaji*, 447 F. App'x at 560; *Calimlim*, 538 F.3d at 713; *Paccar Inc.*, 905 F. Supp. 2d at 696; *Aguirre*, 2013 WL 4446925, at *11. Therefore, summary judgment is not appropriate as to Count I, insofar as Plaintiff pleaded that Defendants are liable for obtaining her services through a scheme to make her believe that she would be deported if she did not remain in the Ngoubene home as a domestic worker. *See* Fed. R. Civ. P. 56(a). Summary judgment in Defendant's favor is appropriate with regard to Plaintiff's other theories of liability on Count I. *See id.*

### B. Count II, False Imprisonment and Conspiracy to Commit False Imprisonment; Count III, Quantum Meruit; Count IV, Unjust Enrichment; and Count V, Replevin

As discussed, Plaintiff left the Ngoubene household in May 2008 and brought this action on October 13, 2011, more than three years later. A three year statute of limitation applies to her common law counts under Maryland law. *See* Md. Code Ann., Cts. & Jud. Proc. § 5-101 (providing that, with exceptions not relevant here, "[a] civil action at law shall be filed within three years from the date it accrues"); *Barnes v. Rawlings-Blake*, No. RDB-10-2525, 2011 WL 2600646, at *3 & n.3 (D. Md. June 28, 2011) (three-year statute of limitations for false imprisonment claims); *Dual Inc. v. Lockheed Martin Corp.*, 857 A.2d 1095, 1099 n.2 (Md. 2004)

(three-year statute of limitations for quantum meruit claims where "'remedy sought in equity is analogous to a remedy cognizable at law'") (citation omitted); *Ahmad v. Eastpines Terrace Apts., Inc.*, 28 A.3d 1, 9 (Md. Ct. Spec. App. 2011) (three-year statute of limitations for unjust enrichment claims "at law"); *Durst v. Durst*, 169 A.2d 755, 756 (Md. 1961) (three-year statute of limitations for replevin claim). Consequently, the statute of limitations on Plaintiff's common law claims ran before Plaintiff filed suit. This fact is undisputed. *See* Defs.' Mem. 61–62; Pl.'s Opp'n to Summ. J. 28. Yet, Plaintiff alleges that, "[d]ue to [Defendants'] actions and the actions of others in preventing Ms. Elat from filing her lawsuit at an earlier date, . . . Defendants are equitably estopped from asserting the defense of limitations." Second Am. Compl. ¶ 93.

Defendants contend that Plaintiff cannot save these claims under the doctrine of equitable estoppel because "there is no factual basis to support such an 'equitable estoppel' theory to toll limitations." Defs.' Mem. 62. According to Defendants, it is undisputed that "in October of 2010, a full year before she actually filed her lawsuit, plaintiff believed she was protected from harm because of being the recipient of a T-1 visa and that belief continued through to the present." *Id.* at 63. In their view, not only did Plaintiff not fear deportation, she also did not consider the possibility of a return to Cameroon to be a threat. *Id.* Defendants allege that the fact that Plaintiff "retained three different attorneys (excluding her current ones) to pursue claims against the Ngoubenes," and "[t]hese attorneys sent letters on behalf of Ms. Elat to the Ngoubenes and to the Ambassador of Cameroon seeking compensation for plaintiff's supposedly unpaid labor" shows that Plaintiff was not "too intimidated to file a lawsuit." *Id.* at 63–64. Alternatively, Defendants argue that "[e]ven assuming that plaintiff was afraid to file her lawsuit because of threats and intimidation by third parties, there is no factual support for contending that defendants themselves engaged in misconduct to cause threats or intimidation." *Id.* at 64.

Plaintiff insists that she "has presented sufficient evidence such that a reasonable finder of fact could conclude that (1) Defendants voluntarily conspired to prevent Ms. Elat from filing suit through threats and intimidation, and (2) these threats and acts of intimidation actually prevented her from filing timely suit." Pl.'s Opp'n to Summ. J. 28. Plaintiff identifies purported threats she received from the ambassador of Cameroon and her uncle Lucien Epah, and she argues that, although her mother "arranged for Lucien Epah to meet with Ms. Elat to give her money, Mr. Epah's knowledge of the potential suit could only have come from the Ngoubene family." *Id.* at 29. Plaintiff asserts that, "[b]ased on these threats, a reasonable finder of fact could conclude that Ms. Elat believed the Ngoubene family would retaliate against her if she filed suit." *Id.*

In the context of a statute of limitations, "[t]he doctrine[] of equitable . . . estoppel derive[s] from the notion 'that a defendant should not be permitted to escape liability by engaging in misconduct that prevents the plaintiff from filing her claim on time.'" *Prelich v. Med. Resources, Inc.*, 813 F. Supp. 2d 654, 663 (D. Md. 2011) (quoting *English v. Pabst Brewing Co.*, 828 F.2d 1047, 1049 (4th Cir. 1987)); *see Murphy v. Merzbacher*, 697 A.2d 861, 866 (Md. 1997) (recognizing application of equitable estoppel doctrine to statute of limitations; stating that "equitable estoppel will not toll the running of limitations absent a showing that the defendant held out any inducements not to file suit or indicated that limitations would not be pleaded") (citations and quotation marks omitted). Thus, "[a]n equitable estoppel inquiry focuses on whether 'the defendant engaged in intentional misconduct sufficient to cause the plaintiff to miss the filing deadline, even though the plaintiff knows that it exists.'" *Id.* (citing *Lekas v. United Airlines, Inc.*, 282 F.3d 296, 301 (4th Cir.2002)) (internal quotations omitted).

Under Maryland law,[20] it "is a question of fact to be determined in each case" by considering whether three elements are present. *JLB Realty, LLC v. Capital Dev., LLC*, No. L-09-632, 2010 WL 786273, at *4 (D. Md. Mar. 3, 2010) The elements are: "(1) voluntary conduct or a representation by the party to be estopped, (2) reliance by the estopping party, and (3) detriment to the estopping party." *Id.* (citing *Bessette v. Weitz*, 811 A.2d 812, 827 (Md. Ct. Spec. App. 2002)). Further, "[a]lthough wrongful or unconscionable conduct is generally an element of estoppel, an estoppel may arise even where there is no intent to mislead, if the actions of one party cause a prejudicial change in the conduct of the other." *Id.* The burden of proof is on the party asserting that an estoppel exists. *Id.* Notably, "[t]he Court applies equitable exceptions sparingly because the certainty and repose the [procedural] provisions confer will be lost if their application is up for grabs in every case." *Prelich*, 813 F. Supp. 2d at 663 (quoting *Moret v. Geren*, 494 F. Supp. 2d 329, 337 (D. Md. 2007) (citation omitted)). Most significantly, equitable estoppel only "bar[s] a defendant from enforcing a statute of limitation when *its own* deception prevented a reasonably diligent plaintiff from bringing a timely claim." *Sebelius v. Auburn Reg'l Med. Ctr.*, 133 S.Ct. 817, 830 (U.S. 2013) (Sotomayor, J., concurring) (emphasis added); *see* Charles Alan Wright & Arthur R. Miller, *et al.*, *Fed. Prac. & Proc*. § 1056 ("[Equitable estoppel . . . hinges on the defendant's representations or other conduct that prevents the plaintiff from suing before the statute of limitations has run.").

Here, Plaintiff has neither alleged nor demonstrated any conduct or representation by any of the Defendants. Rather, the actions she identifies as attempts to dissuade her from filing her

---

[20] "The Supreme Court has indicated strongly that federal courts should apply both the forum state's equitable tolling and equitable estoppel principles when it borrows the state's statute of limitation." Charles Alan Wright & Arthur R. Miller, *et al.*, *Fed. Prac. & Proc*. § 1056 (citing *Wilson v. Garcia*, 471 U.S. 261, 269 (1985), *superseded by statute on other grounds as stated in Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 376–77 (2004)).

lawsuit are actions by her mother, Marie-Thérèse Ngoubene, the Cameroonian ambassador, two of her uncles, and an unknown person or persons who vandalized her car and attempted to enter her apartment. Elat Dep. 89:7 – 91:9, 297:12 – 299:18, 320:9–12, & 321:13 – 324:1; Pl.'s Opp'n to Summ J. 5–6. Fatally, Plaintiff has not shown any connection between these actions and Defendants. *See* Elat Dep. 91:17 – 92:19, 310:5– 311:14. She states that she "believe[d]" that her uncles acted on behalf of the Ngoubene family "[b]ecause they were still in contact with the Ngoubenes," but that is a belief, not evidence. *See id.* Consequently, Plaintiff has not demonstrated that Defendants' own actions prevented her from filing suit earlier. *See Sebelius*, 133 S. Ct. at 830 (Sotomayor, J., concurring); *JLB Realty*, 2010 WL 786273, at *4; *Bessette*, 811 A.2d at 827.

Plaintiff relies on *Jane Doe One v. Garcia*, 5 F. Supp. 2d 767 (D. Ariz. 1998), in contending that Defendants need not have taken affirmative actions to discourage Plaintiff from filing suit. Pl.'s Opp'n to Summ. J. 29–30. In Plaintiff's view, in *Jane Doe One*, where the plaintiff feared retaliation from the defendant, who "impl[ied] to her that he had murdered her boyfriend," the court said that it was immaterial whether the defendant in fact had murdered the boyfriend because "'[e]vidence of the Plaintiff's *asserted* fears is enough to raise a genuine issue of material fact.'" *Id*. at 29–30 (quoting *Jane Doe One*, 5 F. Supp. 2d at 771). She contends that "the Ngoubene family wielded significant control over Ms. Elat" and "continued to threaten her" after she "escaped." *Id.* at 30.

*Jane Doe One*, a case from the United States District Court for the District of Arizona, is not binding on this Court and, in any event, it is inapposite. There, the plaintiff brought suit against a school district and officials in that district, alleging that she was coerced into a sexual relationship with one of the officials, Garcia, when she was a student in that district. *Id.* at 769.

Because she was a minor at the time of the alleged incident, the applicable two-year statute of limitations began to run when she reached the age of majority on June 29, 1994, such that it lapsed June 29, 1996. *Id*. at 770. The plaintiff did not file suit until May 27, 1997, but she argued that "her cause of action against Garcia should be tolled because of duress." *Id*. The court said that the plaintiff had to "show some act or threat by the defendant that precluded the exercise of her free will and judgment and prevented her from exercising her legal rights." *Id*.

Garcia's actions included "continually threaten[ing] to kill himself if Plaintiff reported him," which caused Plaintiff to "fear[] Garcia would hurt himself or her if she revealed the relationship to anyone"; "show[ing] Plaintiff his handgun"; following, paging, and calling her; and making "comments to the Plaintiff which caused her to question whether he was involved in her boyfriends death," after her boyfriend "died in his home under what Plaintiff contends were 'mysterious circumstances.'" *Id*. at 771. Concluding that "Garcia was essentially stalking her," the court found that the plaintiff's "claim of duress [was] sufficiently meritorious that it [could] not be resolved by summary judgement [*sic*]." *Id*. It reasoned that "[w]hether or not Garcia was in fact responsible for her boyfriend's death [was] immaterial" because "[e]vidence of Plaintiff's *asserted* fears is adequate to raise a genuine issue of material fact," such that "[w]hether the Plaintiff's claim of duress tolled the statute of limitations is a question for the jury." *Id*. Thus, it was not the plaintiff's fear alone, but the defendant's many actions causing that fear that created an issue of material fact as to whether the statute of limitations should be tolled. *See id*. In contrast, in the case before me, Plaintiff has not shown that Defendants took any actions, either to stop Plaintiff directly or to have anyone else stop Plaintiff for them.

Moreover, even if Plaintiff had provided evidence to form a basis on which to attribute any of these actions to Defendants, which she has not, her own testimony belies her contention

that these actions left her too frightened to file her lawsuit before the statute of limitations ran. *See* Elat Dep. 319:20 – 325:9. She testified that, as of October 2010, more than six months before the statute of limitations ran, she no longer was afraid that she would be deported. *Id.* Specifically, she testified that her mother "started calling [her] regularly" and "told [her] that she ha[d] to leave the state," but Plaintiff told her mother that "she should stop having those fear, but [she] had that protection" of the T visa; and Plaintiff was not afraid to file suit or worried about deportation. *Id.* Therefore, the doctrine of equitable estoppel is inapplicable. *See Prelich*, 813 F. Supp. 2d at 663.

Plaintiff alternatively contends that equitable tolling should apply such that she may bring these untimely claims. *See* Pl.'s Opp'n 34–35. Yet, Plaintiff does not cite any Maryland law applying equitable tolling. Rather, she relies on a Supreme Court decision, *Burnett v. N.Y. Cent. R.R.*, 380 U.S. 424, 429–30 (1965), that considered the equitable tolling of the federal statute of limitations, and she concedes that "Maryland state courts have treated this doctrine somewhat warily." *Id.* at 34 & n.17. She insists that Maryland courts "have nevertheless applied *Burnett*'s framework to avoid 'the creation of [a] situation where the statute of limitations is a "shield for serious inequity."'" *Id.* at 34 n.17 (citing *Furst v. Isom*, 584 A.2d 108, 112 (Md. Ct. Spec. App. 1991)).

It is true that under federal law, equitable tolling, which as noted "extends to circumstances beyond both parties' control," *Sebelius*, 133 S. Ct. at 830 (Sotomayor, J., concurring), "halts the running of the limitations period so long as the plaintiff uses reasonable care and diligence in attempting to learn the facts that would disclose the defendant's fraud or other misconduct." *Fed. Prac. & Proc.* § 1056. It also is true that the doctrine appears in reported Maryland appellate decisions, albeit rarely. *See, e.g., Philip Morris USA, Inc. v.*

*Christensen*, 905 A.2d 340, 349 (Md. 2006), *abrogated on other grounds by Mummert v. Alizadeh*, 77 A.3d 1049, 1062 (Md. 2013); *Adedje v. Westat, Inc.*, 75 A.3d 401, 408 (Md. Ct. Spec. App. 2013); *Kumar v. Dhanda*, 17 A.3d 744, 754 (Md. Ct. Spec. App. 2011).  But the doctrine applies more narrowly in Maryland:  "In Maryland, equitable tolling only will be applied to 'suspend the running of a statute of limitations . . . if the defendant holds out an inducement not to file suit or indicates that limitations will not be plead[ed].'" *Kumar*, 17 A.3d at 754 (quoting *Christensen*, 905 A.2d at 349); *see Adedje*, 75 A.3d at 408 ("[E]quitable tolling seeks to excuse untimely filing by an individual plaintiff and is generally applicable where the plaintiff has been induced or tricked by the defendant's conduct into allowing the filing deadline to pass.").  Thus, under Maryland law, equitable tolling shares equitable estoppel's requirement that the defendant act to prevent the plaintiff from filing suit.  As discussed above, Plaintiff has not shown any such conduct by Defendants.  *See Christensen*, 905 A.2d at 349; *Kumar*, 17 A.3d at 754; *Adedje*, 75 A.3d at 408.  And, even if the federal doctrine applied, such that I considered instead Plaintiff's "reasonable care and diligence," Plaintiff has not shown that she exercised "reasonable care and diligence" when she felt comfortable filing suit as of October 2010 but waited a year to file suit and has not explained her delay.  *See Fed. Prac. & Proc.* § 1056.

Because neither equitable estoppel nor equitable tolling applies, the statute of limitations bars Plaintiff's claims under Maryland common law.  Summary judgment in Defendants' favor is appropriate on Counts II – V of Plaintiff's Second Amended Complaint.  *See* Fed. R. Civ. P. 56(a).

# VI.  CONCLUSION

In sum, Defendants' Motion in Limine is GRANTED IN PART and DENIED IN PART; Plaintiff's Motion to Amend, which I construe her Opposition to Summary Judgment to incorporate, is DENIED, and Defendants' Motion for Summary Judgment is GRANTED IN PART and DENIED IN PART.

A separate order shall issue.

Dated: <u>January 21, 2014</u>

<u>        /S/             </u>
Paul W. Grimm
United States District Judge

lyb